**Daisy JOHNSON, Dorothy Miller, Forestine Pressy, individually and on behalf of their minor children and on behalf of all others similarly situated, Plaintiffs,**

v.

**NEW YORK STATE EDUCATION DEPARTMENT, Ewald B. Nyquist, as Commissioner of the New York State Education Department, and the Board of Education of Union Free School District No. 27, Town of Hempstead, and Edward Moyer, as Superintendent of the Schools of Union Free School District No. 27, Town of Hempstead, Defendants.**

No. 70–C–1174.

United States District Court,
E. D. New York.

Oct. 28, 1970.

Leonard S. Clark, Westbury, N. Y., for plaintiffs, Carl Jay Nathanson, Freeport, N. Y., Burr C. Hollister, Mineola, N. Y., of counsel.

Louis J. Lefkowitz, Atty. Gen. of New York, for New York State Dept. of Ed. and Ewald B. Nyquist, as Commissioner of the New York State Ed. Dept., Joel Lewittes, Iris Steel, Asst. Attys. Gen., of counsel.

Henry A. Weinstein, for Bd. of Ed., Union Free School Dist. No. 27, Town of Hempstead, and Edward Moyer, as Superintendent of the Schools of Union Free School Dist. No. 27.

TRAVIA, District Judge.

The three plaintiffs are recipients of public assistance and are the parents of six elementary school children who are currently attending schools operated by the Board of Education of Union Free School District No. 27, Town of Hempstead, hereinafter called the "Board." The defendants are the Board, its Superintendent of Schools, Edward Moyer, the New York State Education Department and the Commissioner of Education, Ewald B. Nyquist.

Plaintiffs allege this to be a class action and, therefore, sue individually and on behalf of their minor children and on behalf of all others similarly situated. They challenge the constitutionality of Section 701 of the New York Education Law, McKinney's Consol.Laws, c. 16, and claim that said section is violative of the Fourteenth Amendment of the

Constitution of the United States in that it has the effect of denying plaintiffs equal protection of the laws.

Section 701 provides, in part:

"3. In the several cities and *school districts of the state,* boards of education, trustees or such body or officers as perform the function of such boards *shall have the power and duty to purchase and to loan* upon individual request, *to all children* residing in such district *who are enrolled in grades seven to twelve of a public or private school* which complies with the compulsory education law, *text-books.* Text-books loaned to children enrolled in grades seven to twelve of said private schools shall be text-books which are designated for use in any public, elementary or secondary schools of the state or are approved by any boards of education, trustees or other school authorities. Such text-books are to be loaned free to such children subject to such rules and regulations as are or may be prescribed by the board of regents and such boards of education, trustees or other school authorities.

4. *No school district shall,* during the school year nineteen hundred sixty-six–sixty-seven, the school year nineteen hundred sixty-seven–sixty-eight or the school year nineteen hundred sixty-eight–sixty-nine *be required to purchase* or otherwise acquire *text-books,* pursuant to this section, the *cost of which shall exceed an amount equal to fifteen dollars multiplied by the number of children residing in such district who on the first day of October of such school year are enrolled in grades seven through twelve of a public or private school* which complies with the compulsory education law, *or in any subsequent school year be required to purchase or otherwise acquire textbooks, the cost of which shall exceed an amount equal to ten dollars* multiplied by the number of children residing in such district and so enrolled on the first day of October of such subsequent school year; and

no school district shall be required to loan textbooks in excess of the textbooks owned or acquired by such district; provided, however that all textbooks owned or acquired by such district shall be loaned to children residing in the district and so enrolled in grades seven through twelve in public and private schools on an equitable basis.

5. In the several cities and school districts of the state, *boards of education,* trustees or other school authorities *may purchase supplies and either rent, sell or loan the same to the pupils attending the public schools* in such cities and school districts upon such terms and under such rules and regulations as may be prescribed by such boards of education, trustees or other school authorities.

6. The *commissioner of education,* in addition to the annual apportionment of public monies pursuant to article seventy-three of this chapter, *shall apportion to each school district an amount equal to the cost of the text-books* purchased and loaned by the district pursuant to this section, *but in no case shall the aid apportioned to the district be in excess of the following amounts:* a. on account of expenditures made during the school year nineteen hundred sixty-six–sixty-seven, the school year nineteen hundred sixty-seven–sixty-eight or the school year nineteen hundred sixty-eight–sixty-nine an average of *fifteen dollars per pupil* residing in the district and enrolled in grades seven through twelve, and

b. on account of expenditures made in any subsequent school year an average of *ten dollars per pupil* residing in the district and enrolled in grades seven through twelve." (Emphasis added).

Plaintiffs seek the convening of a three-judge District Court pursuant to 28 U.S.C. §§ 2281 and 2284, a preliminary and permanent injunction enjoining the defendants from enforcing Section

701 [1] and a declaratory judgment declaring said section unconstitutional.

It is alleged that on or about August 31, 1970, plaintiffs were advised by letter from the Board that all children in grades one to six would be required to pay a $7.50 rental charge on the first day of school for the loan of textbooks; that last year the plaintiffs' children, along with all the other children in those grades, received their textbooks without charge; and that on the first day of school this year, textbooks were distributed to all children who paid the rental charge. Plaintiffs also allege that they are recipients of public assistance from the Nassau County Department of Social Services under the Aid to Families with Dependent Children program, and are unable to pay the rental charge,[2] and as a result their children have not received any textbooks.

The imposition of a rental charge for textbooks in grades one to six for the current school year resulted from the action of the local voters in rejecting budgets submitted by the Board in accordance with Section 1716 of the Education Law. On three occasions, the local voters refused to approve a budget.[3] In rejecting the budgets the voters also rejected a tax for the purchase and loan of textbooks free to the children in grades one to six. Authorization for such tax is provided in Section 703 of New York's Education Law.

Section 703 provides:

"1. *The qualified voters* of any school district present at any annual school meeting or at any special school meeting duly and legally called for that purpose, *shall have power*, by a majority vote, to be ascertained by taking and recording the ayes and noes, *to vote a tax for the purchase of all text-books used,* or to be used, *by pupils enrolled in grades one to six,* inclusive, in the schools of the district.

2. *If such tax shall be voted, it shall be the duty of the board* of education or trustees of such district, within ninety days thereafter, *to purchase and furnish free, text-books to all* the *pupils in grades one through six* inclusive attending the schools in such district. Such board of education or trustees shall have power to establish such rules and regulations concerning the use by the pupils of such textbooks, and the care, preservation and custody thereof as it shall deem necessary." (Emphasis added).

As a result, the Board proceeded in accordance with Section 2023 of the New York Education Law which authorizes the Board to levy a tax in the absence of voter approval for the amount estimated to be necessary for teachers' salaries and for ordinary contingent expenses. The Board claimed that it could not consider textbooks for grades one to six to be acceptable ordinary contingent expenses. It based such decision on Opinion 213 of Counsel to the Education Department, dated July 6, 1967. Hence, no tax was levied to cover the cost of the textbooks for grades one to six.

The plaintiffs' claim, in essence, is that Section 701 violates the equal protection clause of the Fourteenth Amendment since it "has arbitrarily and unreasonably created two classes of pupils, those in grades seven to twelve, who will receive free textbooks, and those in grades one through six, who must pay for textbooks" in the absence of § 703 voter approval of a tax to pay for such textbooks.

1. If the operation of § 701 is enjoined, school districts will no longer receive the average of ten dollars ($10) per pupil in grades seven to twelve. Nor will the pupils in those grades be entitled to benefit from the voter-approved tax authorized by § 703 (discussed *infra*) since § 703 is limited to pupils in grades one to six.

2. Recently, New York has adopted a system fixing maximum allowances per family and has eliminated payments for special needs designated as "special needs grants." N.Y. Social Services Law, McKinney's Consol.Laws, c. 55, § 131–a.

3. Only two of these votes were held prior to the opening of school when the decision to impose a rental charge was made.

It must be borne in mind that Section 701 grants free textbooks to children in grades seven to twelve only to the extent of Ten Dollars ($10) per pupil after the school year 1969–1970. Section 701(6b).

### Jurisdiction

■ At the outset we are faced with the question of this Court's jurisdiction. Although the defendants have not raised the question of jurisdiction, this Court may raise that question on its own motion. Thompson v. New York Cent. R. Co., 361 F.2d 137 (2d Cir. 1966). In fact, it is this Court's duty to determine, sua sponte, whether it has jurisdiction. Forgione v. United States, 202 F.2d 249 (3d Cir. 1953), cert. denied, 345 U.S. 966, 73 S.Ct. 950, 97 L.Ed. 1384 (1953); Fullana Corp. v. Puerto Rico Planning Bd., 257 F.2d 355 (1st Cir. 1958). The signing of a show cause order does not prevent a subsequent determination that there is no jurisdiction. Laughlin v. Cummings, 70 App.D.C. 192, 105 F.2d 71 (1939).

In their complaint the plaintiffs base the jurisdiction of this Court on (a) 28 U.S.C. §§ 1331, 1337 and 1343; (b) 28 U.S.C. §§ 2201 and 2202 and (c) 42 U.S.C. §§ 1983 and 1988 and (d) the United States Constitution and the Fourteenth Amendment thereof.

### The Fourteenth Amendment and Section 1331

Since the plaintiffs complain of a denial of equal protection, their action is one that "arises under the Constitution * * * of the United States." 28 U.S.C. § 1331(a). Section 1331(a) also requires that "the matter in controversy exceeds the sum or value of $10,000, * * *." Plaintiffs allege that the amount in controversy exceeds the jurisdictional amount. Obviously, the $7.50 rental charge each plaintiff is required to pay for each child in grades one to six does not approach the jurisdictional minimum.

■ The fact that the action is brought on behalf of a class does not help plaintiffs on this point either. If this action can be brought as a class action, which question need not now be decided, it is settled that the claims of the members of the class may not be aggregated to meet the jurisdictional amount. Snyder v. Harris, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969); Rosado v. Wyman, 414 F.2d 170 (2d Cir. 1969), rev'd on other grounds, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). Hence, the plaintiffs cannot cumulate the rental charges of all children in grades one to six who may be members of the class in an effort to reach the jurisdictional minimum.

■ It can reasonably be asserted that the plaintiffs' children are suffering far greater damages, viz., a substantial loss in their educational opportunity which undoubtedly will have more serious consequences than the amount of the rental charges herein involved. See Brown v. Bd. of Education, 347 U.S. 483 at p. 493, 74 S.Ct. 686, 98 L.Ed. 873 (1954). However, damages of this type are considered too speculative to create jurisdiction under § 1331. See Rosado v. Wyman, supra, and the cases cited therein.

Consequently, jurisdiction does not lie under § 1331.

### Section 1337

■ Plaintiffs' reliance on 28 U.S.C. § 1337 is also erroneous. Section 1337 provides:

> "The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies."

This action does not arise under any Act of Congress and, therefore, there is no jurisdiction under § 1337.

### Sections 2201 and 2202

■ By reason of the fact that the plaintiffs are seeking to have § 701 of the New York Education Law declared unconstitutional, they have cited 28 U.S.

C. §§ 2201 and 2202 to provide a jurisdictional basis. Section 2201 provides:

"In a case of actual controversy *within its jurisdiction* * * *, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." (Emphasis added).

As the statutory wording clearly indicates, § 2201 does not confer jurisdiction, but merely makes a remedy or procedure available in the federal court where jurisdiction already exists. Benson v. State Bd. of Parole and Probation, 384 F.2d 238 (9th Cir. 1967), cert. denied, 391 U.S. 954, 88 S.Ct. 1860, 20 L.Ed.2d 869 (1968); El Paso Building & Construction Trades Council v. El Paso Chapter Associated General Contractors of America, 376 F.2d 797 (5th Cir. 1967). The same jurisdictional requirements for a case or controversy under this section must be met as in other suits. Brown & Root, Inc. v. Big Rock Corp., 383 F.2d 662 (5th Cir. 1967).

Nor does § 2202[4] confer jurisdiction. Section 2202 merely provides for the granting of further relief based on a declaratory judgment.

### Section 1988

Section 1988[5] is not relevant to the question of jurisdiction. Dyer v. Kazuhisa Abe, 138 F.Supp. 220 (D.Hawaii 1956), rev'd on other grounds, 256 F.2d 728 (9th Cir. 1958); Schatte v. Int. Alliance of Theatrical Stage Employees and Moving Picture Operators of United States and Canada, 70 F.Supp. 1008 (S.D.Calif.1947), aff'd, 165 F.2d 216 (9th Cir.), cert. denied, 334 U.S. 812, 68 S.Ct. 1018, 92 L.Ed. 1743 (1948).

### Sections 1983 and 1343

Section 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

If an action falls within § 1983, jurisdiction lies under § 1343, which provides:

"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

\* \* \* \* \* \*

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of

---

4. "Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." (§ 2202).

5. "The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of this chapter and Title 18, for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect;

but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause, and, if it is of a criminal nature, in the infliction of punishment on the party found guilty."

citizens or of all persons within the jurisdiction of the United States * *."

The question is whether § 1983 is sufficiently broad to cover this action. On its face, § 1983 is practically all encompassing. The plaintiffs need only show "the deprivation of any rights, privileges or immunites secured by the Constitution and laws * * *." In protecting "rights * * * secured by the Constitution and laws," § 1983 is capable of being construed as providing unlimited protection not only for "civil rights" but for practically any Federal Constitutional or statutory right without regard to the "amount in controversy" requirement of § 1331. Nevertheless, § 1983 has not been so broadly construed as the wording of the statute would indicate.

Section 1983 comes from § 1979 of the Revised Statutes, which in turn came from § 1 of the Ku Klux Act of April 20, 1871. 17 Stat. 13. Adopted shortly after the end of the Civil War, the statute was enacted to enforce the provisions of the Fourteenth Amendment. This history and purpose of § 1983 have been emphasized by the Supreme Court, Monroe v. Pape, 365 U.S. 167, 171, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); Hague v. CIO, 307 U.S. 496, 509–510, 59 S.Ct. 954, 83 L.Ed. 1423 (1939). Its history shows that the statute "was originally enacted by the Congress in the turbulent days of Reconstruction." Francis v. Lyman, 216 F.2d 583, 586 (1st Cir. 1943). The effect of that turbulence on the statute has been noted by the Supreme Court:

"The dominant conditions of the Reconstruction Period were not conducive to the enactment of carefully considered and coherent legislation. Strong post-war feeling caused inadequate deliberation and led to loose and careless phrasing of laws relating to the new political issues." United States v. Williams, 341 U.S. 70, 74, 71 S.Ct. 581, 583, 95 L.Ed. 758 (1951).

Despite its speedy adoption the statute fell into a lengthy period of disuse. Not until recent years has § 1983 become the popular weapon of plaintiffs seeking entry into the federal courts. That popularity has created serious problems as Judge Magruder observed in Francis v. Lyman, supra, 216 F.2d at pp. 587–588:

"When courts come to deal with a statute phrased in terms of such vague generality, they are faced with two possible alternatives: (1) They may give effect to the statute in its literal wording, and thus reach results so bizarre and startling that the legislative body would probably be shocked into the prompt passage of amendatory legislation. This seems to be the approach which the Third Circuit intended to take in its opinion in Picking v. Pennsylvania R. R. Co., 1945, 151 F.2d 240. (2) The courts may refuse to regard the statute as an isolated phenomenon, sticking out like a sore thumb if given a strict, literal application; and upon the contrary may conceive it to be their duty, in applying the statutory language, to fit the statute as harmoniously as may be into the familiar and generally accepted legal background, and to confine its application, within reason, to those situations which might possibly have had the approval of the Congress if it had specifically adverted to the particular cases, bearing in mind the basic purposes which gave rise to the legislation in the first place. We leave it to others to determine whether such judicial process may fairly be characterized as 'interpretation' of the intent of Congress, as disclosed in the statutory language, or whether it is something else. At any rate, it is a function which courts sometimes feel called upon to exercise and indeed which in many cases they are expected to exercise.

From the trend of decisions applying this particular statute, we think it no longer appropriate for this court to proceed in accordance with the first of the above alternatives. * * * Where the act has been invoked in situations which no doubt were a major concern of the Reconstruction Congress—for instance, where members of

a state board for the registration of voters have refused to permit the registration of a negro, acting under color of discriminatory state legislation—the Supreme Court has not been loath to impose tort liability upon such state officials under the Civil Rights Act. * * * But *beyond such situations, it seems to be the tendency of the decisions to restrict the applications of the Civil Rights Act so as to avoid the appalling inflammation of delicate state-federal relationships which undoubtedly would ensue.*" (Emphasis added).

This Court cannot envision many situations which have the capacity to inflame "delicate state-federal relationships" and state-local relationships more than the present action. Sections 701 and 703, as amended, were born out of a rooted controversy in 1965. Nevertheless, this Court feels it is the better rule to assume jurisdiction of this case under § 1983 and § 1343(3), especially since the "jurisdictional issue" was neither briefed nor argued by the parties, and to consider the claimed deficiencies on the ground that the complaint fails to state a claim upon which relief can be granted. F.R.Civ.P. 12(b) (6).

### Failure to State a Claim

Plaintiffs set forth three causes of action. First, they allege that § 701 creates "an arbitrary, irrational and discriminatory classification which deprives [them] sic and members of their class equal protection of law and an adequate education." Second, plaintiffs claim that § 703, in connection with § 701, subjects their children's right to books "to the arbitrary condition of a local school district tax assessment vote, while no such condition is imposed on older children's right to needed books." Finally, plaintiffs' claim that they are denied equal educational opportunity and equal protection of the laws since textbooks are provided to children who are able to pay while such books are denied to children who are unable to pay.

We start with the proposition that under its Constitution, New York State has the primary responsibility for the maintenance of its educational system. In maintaining that system, it may legitimately attempt to conserve its financial resources by imposing some limitations through classifications on its programs, including its educational programs, so long as those classifications do not violate the equal protection clause of the Fourteenth Amendment. Whether or not a classification, here the statutory requirement in § 701 to provide textbooks rent free, up to a certain average cost, to grades seven to twelve, violates the equal protection clause depends upon whether the classification has an invidiously discriminatory purpose and effect. A classification is invidiously discriminatory if it does not have a "reasonable basis" under the traditional equal protection test [see Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369 (1911)], or if it is not justified by a "compelling" government interest under the more recent fundamental test [see Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1970)]. This Court will assume, without deciding, that the latter test is applicable. Nevertheless, this Court concludes that New York's statutory provisions are free of any invidiously discriminatory purpose and effect since it is supported by a compelling government interest.

Prior to the 1965 amendments, the New York Education Law did not make any provision for free textbooks. Instead, § 701 provided that the

"school authorities may purchase textbooks and supplies and *either rent or sell* the same to the pupils attending the public schools * * *." Former § 701(2). (Emphasis added).[6]

---

6. The present § 701, providing *free* textbooks for children in grades seven to twelve, is not limited to public schools but includes private schools complying with the compulsory education law. The constitutionality of § 701 on this point was upheld in Board of Education of Central School District No. 1 v. Allen, 392 U.S.

It was left to the voters in the school districts to levy a tax for the purchase of textbooks to be furnished free to children attending the public schools in grades one to twelve. Former § 703.[7]

In deciding whether to extend financial aid for the purchase of textbooks for all children in all schools,[8] the New York Legislature had four choices:

1. to make *no contribution* to local school districts for the purchase of textbooks to be loaned free of charge to *any* children and allow the then existing laws to stand;

2. to contribute to local school districts for the purchase of textbooks to be loaned free of charge *to all* children in grades one through twelve and repeal the then existing laws with their conditions;

3. to contribute to local school districts for the purchase of textbooks to be loaned free of charge *to all* children in grades one through twelve and pass additional laws restricting the amount to be used for each pupil in grades one through twelve;

4. to contribute to local school districts for the purchase of textbooks to be loaned free of charge to *some* children and amend Section 703 to provide for the others.

Choice of the first alternative was certainly constitutionally permissible and the plaintiffs do not complain of the failure of the Legislature to make this choice; nor do plaintiffs complain of the fact that the Legislature made a choice.

The Legislature may justify its failure to choose the second alternative on the basis of its legitimate interest in conserving the State's fiscal resources, providing that choice does not result in any invidious discrimination. Since choice of

the second alternative would concededly require an expenditure of funds greater than those needed under the third or fourth alternatives and since this Court cannot compel the State to expend any funds, much less additional funds for textbooks, this Court cannot fault the Legislature's failure to choose the second alternative.

It is the Legislature's choice of the fourth rather than the third alternative which has precipitated this action.

### Choice Made As a Result of Legislature's Desire That As Many Children As Possible Have Textbooks

In making the fourth choice, the Legislature amended § 703 in 1965 to allow the voters in school districts to vote a tax for the purchase of textbooks for the pupils in grades one to six only. As the State defendants have pointed out, the cost of textbooks in grades seven to twelve is considerably higher than the cost of textbooks in grades one to six. Consequently, the grant in § 701 resulted in giving aid where the need was greatest in the event that the voters of a school district failed to vote a tax for the purchase of textbooks under § 703. Had the Legislature adopted the third alternative and substantially reduced the amount of the per pupil grant (below the $15 and $10 figures), then § 703 would of necessity have to be left unamended— i.e., with the voters of a school district given authority to vote a tax for the purchase of textbooks for children in grades one to twelve for the cost above the state grant. If the voters, under such circumstances, failed to vote for such a tax, then the parents would be required to make up the difference between the amount of the grant and the rental charge for textbooks, a difference

236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968).

7. The present § 703, also limited to the public schools, applies only to grades one to six since there is no need for a voter-approved tax for grades seven to twelve in view of the present § 701.

As comparison with the former §§ 701 and 703 reveals, the present sections do not operate to deprive children in grades one to six of anything they possessed prior to the 1965 amendments.

8. "All schools" is limited to public or private schools which comply with the compulsory education law.

which would be considerably more substantial in grades seven to twelve than in grades one to six. The Legislature was entitled to allocate its grant to pupils in those grades where it would do the most good. As the complaint indicates, the rental charge to each pupil in grades one to six is $7.50 per year, which may not be an insignificant amount to the *plaintiffs*, but, when examined from the *Legislature's* point of view, may have represented the more practical alternative. Under the third alternative if the grant were spread thinly among all pupils and the voters failed to approve the additional cost required by Section 703, the parents would be required to pay the difference. In such an event, the cost to the parents with children in grades seven to twelve would be far greater than the cost to these plaintiffs. Additionally, far more parents would be unable to afford textbooks than is true under the present law and far more children would be without textbooks. New York State has a legitimate, compelling interest in seeing to it that as many as possible of its children receive textbooks.

Plaintiffs claim that their children and the other children in grades one to six have at least as great an educational need as children in the higher grades. However, there is no constitutional requirement that school expenditures be made only on the basis of pupils' educational need. McInnis v. Shapiro, 293 F.Supp. 327 (N.D.Ill.1968), aff'd, 394 U.S. 322, 89 S.Ct. 1197, 22 L.Ed.2d 308 (1969). When viewed in this light, it is difficult to say the New York Legislature acted without either a compelling interest or a reasonable basis in choosing the fourth alternative. As the Supreme Court recently pointed out:

"In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.'" Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970).

### Choice Made As a Result of the Legislature's Decision On Educational Needs

In enacting § 701, the Legislature stated in its declaration of legislative policy:

"'The security and welfare of the nation require the fullest development of the mental resources and skills of its youth. This calls for more adequate educational opportunities and increased efforts to educate more of the talent of our nation and requiring the *correction of those imbalances in our educational programs which have led to an insufficient proportion of our population educated in the fields of science, mathematics, foreign languages and other nonsectarian subjects*. The Congress of the United States has reaffirmed the principle that the states and local communities retain primary responsibility for public education. It is hereby declared to be the public policy of the state that the public welfare and safety require that the state and local communities give assistance to *educational programs which are important to our national defense and the general welfare of the state*.'" (Emphasis added).

It was to aid in "the correction of those imbalances in our educational programs" that the Legislature adopted § 701. Apparently, the Legislature felt that such correction could be accomplished by giving aid to assist local school districts in the purchase of textbooks which were to be used by pupils in the "second half" of their schooling, viz., in grades seven to twelve. It is noteworthy that it is in those grades that the sciences, mathematics and foreign languages are most commonly taught. The Legislature's desire to foster the study of certain subjects is sufficient to sustain the classification

Additionally, the plaintiffs have come to the wrong forum. Any changes in the allocation of moneys to local school districts should be made by the Legislature. As the Court said in Snell v. Wyman, 281 F.Supp. 853, 862 (S.D.N.Y. 1968), aff'd, 393 U.S. 323, 89 S.Ct. 553, 21 L.Ed.2d 511 (1969):

> "Plaintiffs' complaints might move us to vote for changes if we sat as state legislators. But they do not approach the showing of irrationality or arbitrariness warranting exercise of the limited veto power of the federal judiciary under the Fourteenth Amendment."

See also, McInnis v. Shapiro, *supra,* where the Court noted at p. 332 of 293 F.Supp.:

> "Without doubt, the educational potential of each child should be cultivated to the utmost, and the poorer school districts should have more funds with which to improve their schools. But *the allocation of public revenues is a basic policy decision more appropriately handled by a legislature than a court.*" (Emphasis added).

Accordingly, it is

Ordered that plaintiffs' motion is in all respects denied, and, it is further

Ordered that the complaint be dismissed.