**HUNTSVILLE CITY BOARD OF ED-
UCATION, et al., Plaintiffs,**

**United States of America,
Intervenor,**

v.

**LeRoy BROWN, as Superintendent of Ed-
ucation for the State of Alabama,
et al., Defendants.**

Civ. A. No. 74–62–N.

United States District Court,
M. D. Alabama, N. D.

July 15, 1974.

Gary C. Huckaby, Huntsville, Ala.
(Smith, Huckaby & Graves), Huntsville,
Ala., for plaintiffs.

Ira DeMent, U. S. Atty., and Kenneth E. Vines, Asst. U. S. Atty., M. D. Ala., Montgomery, Ala., and Harland F. Leathers and John T. Boese, Civ. Div., Dept. of Justice, Washington, for intervenor, the United States.

Charles M. Crook, Montgomery, Ala. (Smith, Bowman, Thagard, Crook & Culpepper), Montgomery, Ala., was counsel for the Superintendent of Education for the State of Alabama and the members of the Alabama State Board of Education.

C. Lynwood Smith, Jr., Huntsville, Ala. (Bell, Richardson, Cleary & Tucker), Huntsville, Ala., for the Superintendent of Education for Madison County and the members of the Madison County Board of Education.

Before GODBOLD, Circuit Judge, and JOHNSON and VARNER, District Judges.

JOHNSON, District Judge:

This suit involves a controversy over the distribution of Title I funds within Madison County for the 1973–74 school year.[1] In July, 1973, defendant Dr. LeRoy Brown, State Superintendent of Education for Alabama, determined pursuant to his statutory authority under Title I that plaintiff Huntsville City Board of Education was entitled to $657,034.00 of the federal allocation for Madison County and that the Madison County Board of Education was entitled to $364,346.00. More than half-way through the school year, defendants altered this allocation, claiming that the appropriations bill passed by Congress in December, 1973, prevents them from making the division of funds as originally determined. In this suit, plaintiffs seek to enjoin defendants from changing the original allocation of funds between the Huntsville City (located within Madison County) and Madison County Boards of Education. Plaintiffs now move for summary judgment, and defendants move

for dismissal or, alternatively, for summary judgment. The case is submitted on the pleadings, briefs, affidavits, and supporting documents of the parties.

### Jurisdiction

The plaintiffs cite the following statutory provisions as basis for this Court's jurisdiction: 28 U.S.C. §§ 1331, 1343(3), 1343(4), 1361, 1391, 2201, and 2202. Defendants strongly argue that none of these provisions will support jurisdiction in this case. As plaintiffs sufficiently meet the jurisdictional requirements of 28 U.S.C. § 1331, it will be unnecessary to discuss defendants' other contentions.

Section 1331 is the general "federal question" statute which provides for federal jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States where the matter in controversy exceeds $10,000. Although no one disputes the fact that this case "arises under the Constitution, laws . . . of the United States," defendants contend that plaintiffs fail to satisfy the jurisdictional amount requirement. This suit is brought by the Huntsville City Board of Education on its own behalf and by the parents of educationally disadvantaged children as a class action on behalf of these children and all other educationally disadvantaged children within the Huntsville City attendance zone. Clearly the Huntsville City Board is a proper party in this action which has more than $10,000 in controversy, and therefore this Court may properly take jurisdiction under 28 U.S.C. § 1331. Defendants, however, challenge the class action feature of the suit, arguing that the claim of each member of the proposed class is less than the requisite $10,000 to support federal question jurisdiction.

It is clear that the members of a class may not aggregate their claims to satisfy the $10,000 requirement. See Zahn v. International Paper Co., 414 U.S.

---

1. Title I of the Elementary and Secondary Education Act, 20 U.S.C. § 241a et seq., sets up a program of federal grants to states and localities for establishing educational programs designed to help children from low-income families.

291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1974); Snyder v. Harris, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969). But plaintiffs' prayer is for injunctive relief, not damages. In injunction cases the amount in controversy is the value of the right to be protected or the extent of the injury to be prevented.[2] In this case, plaintiffs allege the loss of substantial educational opportunity by the curtailment of Title I programs. In establishing Title I, Congress expressly recognized the importance of meeting the special educational needs of children from low-income families by providing supplemental programs to the regular school curriculum. The evidence before Congress reflected that children from low-income families started school with a lower level of achievement than their classmates and that, if this disparity were not corrected by special programs, the deficiency would continue throughout the educational process and ultimately result in these children's receiving a substandard education. In light of this

legislative history, the effect of the loss of Title I programs is not remote or incidental, and the lost educational opportunity—the injury sought to be prevented by this lawsuit—is not entirely speculative.[3] Plaintiffs' allegation of the requisite $10,000 in controversy is sufficient as to each member of the class to support this Court's jurisdiction under 28 U.S.C. § 1331.[4]

*Merits*

To fully understand the issues of this controversy, it is necessary to set forth the background and history of this case in some detail. Title I of the Elementary and Secondary Education Act, 20 U.S.C. § 241a et seq., provides for federal financial assistance to states and counties to set up and to fund programs for educationally deprived children.[5] Responsibility for the administration of Title I funds is divided among the United States Office of Education and the various state and local educational agencies.

2. See, *e. g.*, Pennsylvania R.R. Co. v. City of Girard, 210 F.2d 437 (6th Cir. 1954); Marquez v. Hardin, 359 F.Supp. 1364 (N.D.Cal. 1969); Connelly v. Univ. of Vermont & State Agricultural College, 244 F.Supp. 156 (D. Vt.1965).

3. When a deprivation of education is involved, courts have generally not required a strict showing of $10,000 in controversy. See, *e. g.*, Oestereich v. Selective Service System, 393 U.S. 233, 89 S.Ct. 414, 21 L.Ed.2d 402 (1968); Walsh v. Local Board No. 10, 305 F.Supp. 1274 (D.C.N.Y.1967); Armendariz v. Hershey, 295 F.Supp. 1351 (W.D.Tex. 1965); Connelly v. Univ. of Vermont & State Agricultural College, 244 F.Supp. 156, 159 (D.C.Vt.1965). Defendants cite Johnson v. New York State Education Department, 319 F.Supp. 271 (E.D.N.Y.1970), aff'd 449 F. 2d 871 (2d Cir. 1971), vacated and remanded to determine whether moot, 409 U.S. 75, 93 S.Ct. 259, 34 L.Ed.2d 290 (1972), for the proposition that an allegation of lost educational opportunities is too speculative to satisfy the amount in controversy requirement. But in *Johnson* the speculation resulted from the fact that a cost of $7.50 per pupil as a rental charge for textbooks was by itself too tenuous to establish a loss in educational opportunity. The loss of educational opportunity is far from speculative in this case, and

plaintiffs are able to demonstrate a real and substantial loss to a low-income child from the termination of Title I programs.

4. Even if the Court were to hold that plaintiffs' class did not meet the jurisdictional amount requirement, the Huntsville City Board, as a proper plaintiff under 28 U.S.C. § 1331, would likely have standing to represent the claims of its school children. See Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).

5. In establishing the Title I program, Congress recognized "the special educational needs of children of low-income families and the impact that concentrations of low-income families have on the ability of local educational agencies to support adequate educational programs, [and declared] it to be the policy of the United States to provide financial assistance . . . to local educational agencies serving areas with concentrations of children from low-income families to expand and improve their educational programs by various means (including preschool programs) which contribute particularly to meeting the special educational needs of educationally deprived children." 20 U.S.C. § 241a.

Title I funds are allocated under the following scheme. The overall Congressional appropriation for Title I is allocated among the states by the Office of Education based on calculations of the number of educationally deprived children within each state. In addition, the Office of Education allocates each state's total share among the various counties within each state. Allocation of funds among "local education agencies" (or school systems) within a county is made by the state education agency—in this case, the State Department of Education.[6] The State Department of Education is directed to allocate funds among local school districts within a county "on the basis of those available data which it deems best to reflect the current distribution in the county of children aged 5 to 17, inclusive, from low-income families . . . .."[7]

In 1965, when the Title I program commenced, the distribution of funds among local school systems within Alabama was based to a large extent on 1960 census data showing the location of Title I children in each county. In Madison County, this data resulted in the following distribution ratio for the division of Title I funds: Huntsville City, 35.6 per cent; Madison County, 64.4 percent. After this initial allocation for the 1965–66 school year, the Huntsville City School System made periodic inquiries to the state board about updating the Madison County distribution ratio. The Huntsville Board contended that more recent data would show a substantial population shift in Madison County. However, the original 35.6–64.4 distribution ratio remained unaltered through the 1971–72 school year. In the summer of 1972, the Alabama Department of Education formulated a policy for adjusting the county distribution ratios throughout the state. Anticipating that the final 1970 census would reveal substantial changes in the location of Title I children, the state department planned a partial readjustment of Title I funds for the 1972–73 school year based on early census data.[8] Under this plan, those systems with a decrease in Title I children would receive 85 percent of their previous year's allocation, and the remaining funds would be distributed to those systems which had experienced an increase in their Title I population. The Alabama State Department further proposed that for the 1973–74 school year a complete readjustment would be made of the distribution ratios in those counties experiencing population shifts based on final 1970 census data. This plan thus provided for a full readjustment of county suballocations over a two-year period.

This two-step readjustment, however, was unacceptable to the Huntsville City Board of Education. The Huntsville Board felt that it had long been evident that its school system was entitled to a larger percentage of the Title I funds for Madison County, and therefore an immediate readjustment should be made for the 1972–73 school year. Accordingly, on November 27, 1972, the Huntsville City Board filed a motion for preliminary injunction in this Court against HEW and the State Board of Education seeking a complete readjustment of the distribution ratio for 1972–73.[9]

6. For example, the Office of Education determines each year the "county aggregate maximum grant" for Madison County, Alabama, which is the total amount of Title I funds that is to be distributed in Madison County. It is the responsibility of the Alabama Department of Education to then suballocate these funds between the Huntsville City School System and the Madison County School System.

7. 45 C.F.R. § 116.4 (1973).

8. Although it was apparent from preliminary 1970 census figures that substantial population shifts had taken place, the final census figures on which Title I distributions were based were not available until the 1973–74 allocations.

9. Plaintiffs also sought an adjustment of future funds to compensate for the years 1965–1971 when outdated data had been used to determine the suballocation for Madison County.

On mutual motions for summary judgment, Judge Varner of this district denied the Huntsville City Board's motions for relief. Judge Varner ruled that the federal regulations specifically provide for an orderly readjustment of the sub-allocations to local school systems.[10]

The record shows that the 1970 census figures are now available for the planning of the next school year and that the State Department of Education contemplates a readjustment of appropriate funds for the two Boards of Education in Madison County. This Court, balancing the equities in view of the federal regulations, finds that it should not interfere with the current plans of the various Boards of Education based on currently allocated funds, particularly in view of the fact that the State Department of Education will reapportion the funds for the next school year in a timely manner so that proper plans can be made to the detriment of a minimum of personnel.[11]

For the 1973–74 school year, the Alabama Department of Education did undertake a complete readjustment of the Madison County distribution ratio. Based on 1970 census data, it was determined that 64.3 percent of the county's Title I children now attended the Huntsville City School System, and 35.6 percent attended the Madison County System. However, since Congress had not yet passed the appropriations bill for the Title I programs, the allocation of funds to the two systems could only be made on a tentative basis. Funding was available, however, under a continuing resolution of Congress that allowed for Title I programs to be maintained at their 1972–73 level until a new appropriations bill was enacted. Thus, on July 23, 1973, the State Superintendent

of Education made a tentative allocation of Title I funds; Huntsville City received $657,034.00, and Madison County received $364,346.00. Relying on these figures, the two school systems hired teachers, committed funds, and began their Title I programs for the 1973–74 school year.

On December 18, 1973, Congress finally passed the appropriations bill for Title I programs. The act, however, contained the following provision:

. . . That the aggregate amounts made available to each State under title I–A of the Elementary and Secondary Education Act for grants to local educational agencies within that State shall not be more than 120 per centum of, nor less than, such amounts as were made available for that purpose for fiscal year 1973, and *the amount made available to each local educational agency under said title I–A shall not be less than 90 per centum of the amount made available for that purpose for fiscal year 1973.*[12]

The Alabama State Department was informed by the Office of Education that this language precluded its original commitment to the Huntsville City Board of Education to completely readjust the Madison County distribution ratio based on 1970 census data. Thus, in compliance with this directive, the Department of Education made a final allocation for Madison County, reducing the share allotted to the City of Huntsville to $419,493.00.[13]

Plaintiffs contend that the 90 percent requirement as applied to the facts of this case violates the Equal Protection Clause. All parties agree that this case involves neither a fundamental interest nor a suspect classification. See San Antonio Independent School District, v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278,

---

10. 45 C.F.R. § 116.4(f) (1973).

11. Order of March 14, 1973, at 5.

12. Public Law 93–192 (Dec. 18, 1973) (emphasis added).

13. The tentative allocation in July, 1973, was based on an estimated one million dollar al-

location for the entire county. However, the final appropriations bill did not meet this initial estimate. The amount to be divided between the two boards is now only $904,000.00. Thus, aside from the requirements of Public Law 93–192, each board faces a 15 percent reduction of these funds tentatively allocated in July, 1973.

36 L.Ed.2d 16 (1973). Hence, to prevail, plaintiffs must demonstrate that, as applied to these facts, the 90 percent requirement has no rational basis. This Court concludes that plaintiffs have failed to carry this burden.

In its consideration of the 1973–74 appropriations bill for Title I programs, Congress was particularly concerned about the effect that the 1970 census data would have on Title I allocations among states and within states. This 1970 data, Congress had been informed, would be applied *for the first time* in the computation of the 1973–74 Title I allotments. Since the beginning of the Title I program, allocations to states and local agencies had been based primarily on the 1960 census data. Many local school districts, in reliance on these funds, had established high levels of activities. But it was apparent that, since the compilation of the 1960 census, substantial shifts in population had taken place. Although these changes had taken place over a number of years, there had generally been no corresponding alteration in Title I allocations. Congress thus anticipated that the adjustment of Title I allocations to reflect 1970 census data would cause disruptions throughout the country as long established programs were forced to accept massive cutbacks in their Title I programs.

This concern is summarized by the Senate Committee on Appropriations in its report on the appropriations bill.

> The Committee expects that the latest available 1970 census data will be used in determining State allotments. Until now, 1960 census data has been used to determine allotment levels. The Committee recognizes the hardship this would place on the educational systems of such States; substantial changes in the proportionate number of eligible children by State would cause some State entitlements to drop by up to 50 percent . . . . In order to lessen the impact of these changes, the Committee recommends a floor provision to ensure that no State would receive less than 90 percent, nor more than 110 percent, of its total 1972 allotment. This would provide a transition period for those States whose allotments would otherwise be drastically reduced, and funds will be more equitably allocated to poverty areas.[14]

In the course of debate on this Appropriations Act, there was much comment by many members of Congress that this proviso, although it protected the states, did not provide similar protection for the local educational agencies. Thus, Representative Quie from Minnesota introduced an amendment which eventually evolved into the proviso now in dispute. He explained his amendment on the floor of the House:

> . . . I recommend that we hold each local education agency harmless at 90 percent of what they received in 1973, and then put a 120 percent limit on each State, so that the local education agencies within the State which have had a substantial increase in the number of low-income children will be able to receive the funds they need to finance their compulsory education programs.[15]

Representative Holt of Maryland spoke on the House floor in support of the Quie Amendment.

> This proposed formula is, in my opinion, an equitable one which recognizes two important facts. Federal funds under the title I program should be channeled to those school districts which serve the children of low-income families. An increase in the maximum funding to 120 percent of what was received in fiscal year 1973, will aid us in achieving this objective. *However, we must also bear in mind that these programs have been in operation since September. School districts which planned their programs on the basis of funds available during previous years must be protected from sudden cutbacks this late in the se-*

14. S.Rep.No.93–414, 93rd Cong., 1st Sess. 68 (Oct. 2, 1973).

15. 19 Cong.Rec. H9922 (Nov. 13, 1973).

*mester.* The 90 percent floor on payments will afford such protection.

The implementation of the proposed formula will allow a gradual shift away from the 1960 census data without imposing drastic curtailment in funds for school districts which currently have programs in operation.[16] Representative Quie's amendment was essentially adopted by the Conference Committee, and ultimately as part of Public Law 93–192.

 This legislative history reveals that the 90 percent requirement was intended by Congress to prevent local public school districts from having to cut back substantially on the level of activities which they had already undertaken with the aid of federal funds. As such, the law serves a very real purpose by providing for an orderly transition from 1960 to 1970 census data. This purpose constitutes a substantial, rational basis for the challenged portion of the legislation. Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491; Richardson v. Belcher, 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231.

Accordingly, judgment will be entered for defendants.

16. *Id.* at H9926 (emphasis added).