James B. BENNETT et al., Plaintiffs, and
Carl A. Brown et al.,
Intervening Plaintiffs,

v.

Louis A. GRAVELLE, individually and in his capacity as Chairman (now Member) of the Washington Suburban Sanitary Commission, Salvatore Barranca, individually and in his capacity as Vice-Chairman (now Chairman) of the Washington Suburban Sanitary Commission, Peter R. Bozick, individually and in his capacity as a Member of the Washington Suburban Sanitary Commission, Carter C. Hubbel, Jr., individually and in his capacity as a Member of the Washington Suburban Sanitary Commission, John J. McBurney, individually and in his capacity as a Member of the Washington Suburban Sanitary Commission, George W. McRory, individually and in his capacity as a Member of the Washington Suburban Sanitary Commission, Defendants.

Civ. A. No. 70-534-N.

United States District Court,
D. Maryland.

Jan. 19, 1971.

Kenneth L. Johnson, Baltimore, Md., and Richard B. Sobol and Richard T. Seymour, Washington, D. C., for plaintiffs and intervening plaintiffs.

J. Lloyd Niles, John B. Kenkel and Charles M. Byrd, Hyattsville, Md., and Thompson Powers and Martin P. Schneiderman, Washington, D. C., for defendants.

Stephen D. Shawe, Baltimore, Md., for The Maryland Commission on Human Relations, amicus curiae.

Stanley P. Hebert, Robert Fitzpatrick and Craig T. Sawyer, Washington, D. C., for The Equal Employment Opportunity Commission, amicus curiae.

NORTHROP, Chief Judge.

The plaintiffs in this proceeding are twenty-seven (27) black and two (2) white former employees of the Washington Suburban Sanitary Commission (WSSC) who were discharged for engaging in an unlawful walkout against the WSSC; four (4) current black employees of the WSSC who intervened after this action commenced; and one minor black woman suing through her fa-

ther for the denial of employment by the WSSC, who likewise intervened after this action commenced. The defendants are the six (6) members of the Commission being sued personally as well as in their official capacity.

The gravamen of this dispute centers on whether the WSSC has participated in any racial discrimination against the plaintiffs individually as well as a class. Each of the plaintiffs is suing not only in their individual capacity but also is suing as the representative of their class. The class, as stated in plaintiffs' complaint, constitutes all former, present, and future black employees of the WSSC as well as past, present and future white employees who are or will be adversely affected by the practices challenged herein.

The plaintiffs are seeking injunctive relief requiring the termination of all alleged racially discriminatory practices in employment, assignment and working conditions by the defendants, their agents and employees; reinstatement and back pay and other damages for those employees discharged for participating in the unlawful walkout; the termination of all policies that impose more onerous and less desirable working conditions on black workers than those that are afforded white workers; the cessation of disproportionate allocation, because of race, of job training opportunities; damages or back pay in an amount that will compensate plaintiffs and members of their class for the higher levels of pay and other benefits they have been denied because of the alleged racially discriminatory employment policies; the recruitment of new black employees in such a manner as to correct the effects of long-standing racial discrimination; and such other and further relief as this court may deem to be just and proper.

The defendants contend the plaintiffs are not entitled to relief since

(a) defendants in their official capacities are extensions of the WSSC, and neither the Fourteenth Amendment nor 42 U.S.C. §§ 1981, 1983 and 1988 pro-

vides a basis for an action for back pay or other monetary damages against a governmental entity; and

(b) in their individual capacities, defendants are immune from liability for back pay or other damages under 42 U.S.C. §§ 1981, 1983 and 1988 for the exercise of their official discretion.

Defendants further assert that they delegated the function of job hiring, assignment and working conditions to a General Manager and other subordinate officials and that these individuals were exclusively responsible for such functions. Therefore, the defendants contend they cannot be held accountable under section 1983 since that section does not impose liability under the doctrine of *respondeat superior* but solely against an individual acting in his personal capacity. Furthermore, as to the discharged plaintiffs, the defendants allege their release was solely for striking against a public agency in violation of Maryland law and not because of any acts of racial discrimination on the part of the defendants. The assigned reason for the walkout concerned the working conditions of employees, specifically a newly announced rule dealing with non-emergency work. This dispute involved solely a labor-management grievance and not racial discrimination. Defendants further assert that an award for damages to plaintiffs in an amount that would compensate them for higher levels of pay and other benefits because of the alleged racial discrimination is not an appropriate ground for a class action. The final contention of defendants is that plaintiffs should be denied all relief in that they have failed to exhaust the appropriate administrative remedies that are available to them and capable of providing the requested relief.

Plaintiffs bring this action pursuant to 42 U.S.C. §§ 1981, 1983 and 1988 and the due process and equal protection clause of the Fourteenth Amendment. Jurisdiction over this action is conferred by 28 U.S.C. § 1343(3) and (4). The defendants have moved this court for dismissal as to each and every plaintiff

individually as well as to the class they represent.

Because of the number of plaintiffs involved in this proceeding, and the claims they advance, this opinion will discuss, so far as is practical, the complaint and defenses as they relate to each group of plaintiffs and the class they represent.

## DISCHARGED EMPLOYEES

The discharged employee plaintiffs allege that the defendants, personally and through their agents and employees, have systematically and purposefully practiced discrimination on the grounds of race in hiring and in employee assignments and promotions. Plaintiffs allege they protested these actions to defendants on numerous occasions to no avail.

As an example of this discrimination, plaintiffs contend that all but two (2) of the approximately one hundred and fifty (150) laborers at the Commission's Anacostia Yard are black. Plaintiffs allege that the laborer's jobs are the lowest paid and the least desirable jobs with the Commission. By contrast, forty-two (42) of the sixty-three (63) foremen, who supervise the work of the laborers, are white. At the Commission's Anacostia Yard, all of the approximately twenty (20) meter readers are white. All of the mechanics are white. All of the employees in the craft jobs, such as welders and carpenters, are white. All of the supervisors are white. All but a handful of the skilled heavy equipment operators are white. All but three of the white-collar workers at the Commission's central offices in Hyattsville are white. In addition to the maintenance of racial restrictions in hiring, assignment and promotions, plaintiffs also maintain that they and the class they represent were subjected to more onerous and less desirable working conditions than those afforded white employees. For example, black laborers were required to ride in the back of unheated trucks, regardless of the weather, while white foremen rode in heated cabs.

On March 5, 1970, the defendants adopted a new regulation requiring that laborers in the Maintenance and Operations Division do non-emergency outdoor work, during inclement weather. This rule was instituted without any consultation with the employees affected. The only employees affected by this rule, with the exception of the two white plaintiffs, were black. No other employees were required to do such non-emergency work. Plaintiffs contend that as a direct and proximate consequence of this continued discrimination, and because of their exacerbation by the regulation adopted that day, plaintiffs and certain members of the class they represent walked off their jobs in protest. By a letter dated March 6, 1970, defendant Commissioner McBurney informed plaintiffs and the class members they represent that they were required to return to work on March 9 or face immediate discharge. Plaintiffs maintain that since these letters did not contain assurances that the racially discriminatory practices would be corrected, they refused to return to work. They were subsequently informed that they had been dismissed. Plaintiffs now seek reinstatement with back pay from March 6, 1970, along with such other and further relief as may be just and proper.

Because this court accepts the defendants' contention that relief should be denied to these plaintiffs since they were discharged for participating in an unlawful walkout and not for any acts of racial discrimination, we need not, as to these plaintiffs, answer the defendants' other contentions.

Plaintiffs have cited no cases, nor has this court been able to find any, dealing with the specific question presented before this court—whether an individual has a right to strike in violation of a valid state or federal no strike law, when the claimed purpose is to protest alleged racial discrimination. This court is of the opinion that this issue should be decided on the basis of established law and not by exception carved out by this court.

■ The accepted common law rule as adopted in Maryland and in other jurisdictions is that absent an authorizing statute, a public employee has no right to strike. *E. g.*, International Union of Operating Eng'rs Local Union No. 321 (A.F.L.–C.I.O.) v. Water Works Bd., 276 Ala. 462, 163 So.2d 619 (1964); City of San Diego v. American Fed'n of State, County and Municipal Employees, 8 Cal.App.3d 308, 87 Cal.Rptr. 258 (1970); Mugford v. Mayor and City Council of Baltimore, 185 Md. 266, 44 A.2d 745 (1945). This common law rule has been adopted or confirmed statutorily by twenty (20) states and the federal government. *See* City of New York v. DeLury, 23 N.Y.2d 175, 182, 295 N.Y.S.2d 901, 905, 243 N.E.2d 128, 131 (1968); 5 U.S.C. § 7311; Rubin, A Summary of State Collective Bargaining Law in Public Employment (1968).

■■ Manifestly, neither the federal constitution nor any provision of Maryland's Constitution grants to an individual an absolute right to strike. In the case of public school teachers where the Maryland Legislature has granted and authorized the right to organize and bargain collectively, the Legislature has specifically prohibited any strike action. Md.Ann.Code, Art. 77, § 160(*l*) (1957).

But while an individual does not have an absolute right to strike, a state cannot arbitrarily or capriciously deny this conduct. A state, in governing its internal affairs, can prohibit any strike only if the prohibition is reasonably calculated to achieve a valid state policy in an area open to state regulation. *Cf.* International Bhd. of Teamsters Local 695, A. F. L. v. Vogt, Inc., 354 U.S. 284, 294–295, 77 S.Ct. 1166, 1 L.Ed.2d 1347 (1957).

Courts dealing with the constitutionality of state statutes prohibiting public employees from striking have expressly rejected constitutional objections to this legislation. These statutes prohibiting and punishing strikes by public employees have been upheld where they have been narrowly drawn. *E. g.*, Norwalk Teachers' Ass'n v. Board of Educ.,

138 Conn. 269, 83 A.2d 482 (1951); Pruzan v. Board of Educ., 9 N.Y.2d 911, 217 N.Y.S.2d 86, 176 N.E.2d 96 (1961); City of Cleveland v. Division 268 of Amalgamated Ass'n, Ohio Com.Pl., 90 N.E.2d 711, 41 Ohio Op. 236 (1949).

Plaintiffs do not challenge directly this common law rule prohibiting strikes by public employees. They recognize, as does this court, the compelling governmental interest in preventing public employees from creating work stoppages. Since public employees are vested with the safety, health, and welfare of all who they serve, it is essential that their services be maintained. Governor Thomas E. Dewey succinctly stated these reasons in a memorandum approving the Condin-Wadden Act—the predecessor of the New York Taylor Law, N.Y. Civil Service Law § 200 *et seq.* (McKinney's Consol.Laws, c. 7, Supp. 1970–71):

> The duty of public employees is to the whole of society. A strike of firemen could overnight permit the destruction of a whole city. A strike of police could endanger the safety of millions of people and all of their possessions. *A strike of sanitation workers could almost overnight produce an epidemic threatening the lives of other millions of people.* (emphasis added).

In Commissioner McBurney's letter of March 6, 1970, requesting the striking employees to return to their work, he stated,

> This Commission is charged with the responsibility of maintaining vital public water and sewer services in the Sanitary District. WSSC employees have to recognize their role in providing this service to the public and work stoppages cannot be permitted.

Louis A. Gravelle in his affidavit dated June 18, 1970, stated that the work stoppage on March 5th and 6th "substantially disrupted the work of the WSSC." He reiterated that it was essential that there not be a work stoppage for the services provided by the Commission were "essential to the health and welfare of all the citizens of Prince George's and Montgomery Counties."

Plaintiffs, while admitting that their actions were in direct contravention of Maryland law, urge upon this court the adoption of a limited exception to this prohibition. Plaintiffs would have this court adopt a right to reinstatement and back pay if a discharged employee could show

1. the *predominant* purpose of the strike was to protest, or bring about changes in, employment practices

 a) which are racially discriminatory, and therefore unconstitutional, *and*

2. The employees had made *reasonable efforts,*

 a) over a *reasonable period* of time,

 b) to bring about changes by means short of a strike, *and,*

 c) had not received *reasonable success* in obtaining effective changes, *and*

3. there was *in fact*

 a) *substantial* racial discrimination in the public

 b) employment practices,

 c) at the time of the strike, and

4. the National Labor Relations Act, 29 U.S.C. § 151 et seq. did not cover the employees.

Only if a plaintiff could prove that he met *all* the conditions outlined above would he be able to secure reinstatement and recover back pay.

Plaintiffs admit, however, that there were other avenues of recourse available to them to redress employment discrimination. But they urge this court's adoption of the above criterion contending that relief from discrimination would be expedited with a commensurate saving in expense. This argument seems to be specious at best. Plaintiffs admit that the ultimate decision would be up to a court of law to determine whether the criterion outlined above, if adopted by this court, was met. This court cannot say that this latter method would be any less expensive or time-consuming than the conventional method of seeking injunctive relief to compel the cessation of the discriminatory practices. When viewed in the light of the possible detrimental effects to the public, this court feels incumbent to uphold the long standing policy that militates against strikes by public employees. Any other standard would embroil the courts in complex determinations of the predominant cause of public employee strikes, the reasonableness of the efforts made by striking employees to settle their grievances before striking and the substantiality of any racial discrimination found to exist.

It has long been established that an agency of local government can be prevented by the force of a federal injunction from engaging in racial discrimination in its employment practices. Alston v. School Board of City of Norfolk, 112 F.2d 992 (4th Cir.), cert. denied, 311 U.S. 693, 61 S.Ct. 75, 85 L.Ed. 448 (1940); Mills v. Board of Educ., 30 F.Supp. 245 (D.Md.1939). While these cases dealt with racial discrimination in the pay rates of public school teachers, the principle of law applied in those opinions is applicable to any acts of racial discrimination practiced by any agency or instrumentality of local government.

Plaintiffs cite Smith v. Hampton Training School for Nurses, 360 F.2d 577 (4th Cir. 1966) in support of their contention that this court has the power to order reinstatement and back pay for the defendants' alleged discriminatory conduct. This case, however, can be distinguished on its facts. In *Smith,* three black nurses refused to "abide by the hospital's established policy of racial discrimination" in dining facilities by eating in what was designated as the white only cafeteria. They were subsequently discharged for violating this hospital rule. The Fourth Circuit held:

These nurses were dismissed solely for protesting the hospital's prohibited practice of racial discrimination. *There was no lawful basis for* the practice or for *the discharges,* and the plaintiffs are entitled to be reinstated

to the positions they occupied when they attempted to assert their rights. *Id.* at 581. (emphasis added).

■ The *Smith* case is different from the one before us in that the plaintiffs herein were discharged not for any alleged acts of racial discrimination but for striking in violation of a valid state no-strike policy as it relates to public employees. By participating in an unauthorized and unprotected strike, public employees subject themselves to disciplinary action including discharge. *See* Herriges v. United States, 314 F. Supp. 1352 (D.Mont.1970). Contrary to *Smith,* the defendants in this proceeding had a lawful basis for discharging the plaintiffs.

Plaintiffs *do not* allege that the return to work notices sent by the Commissioner or the discharge of employees for failing to return to work were discriminatory. Commissioner McBurney's letter of March 6th was directed to all employees who were engaged in the illegal walkout. Letters were sent to each employee's residence as well as posted throughout the working area at the Anacostia Yard. Each letter warned the employees that their failure to return to work on March 9th would result in their discharge. All who returned to work on March 9th were reinstated without any further penalty than the loss of pay for those days missed. All who failed to return were dismissed. There is no allegation that the defendants discriminated in any way as to who was discharged or who was reinstated. The sole criterion was whether the employees returned to work on March 9th. This court therefore is of the opinion that the plaintiffs were discharged solely for engaging in an unlawful walkout and it was within the power of the Commission to discharge those who refused to return to work.

■ There is a strong public policy opposed to the interruption of essential public services. This court feels that to override this policy and carve out exceptions is a task that is peculiarly suited to the Maryland Legislature, and not

this court. Such a unilateral change in policy has not been adopted by any other court. Absent a clear statutory or legislative authorization, it is not the province of this court to make such a change. Defendants' motion for dismissal as to these plaintiffs is therefore granted.

## CURRENT EMPLOYEES

Four current black employees at the WSSC Anacostia Yard, suing in their own behalf and on behalf of the class they represent, likewise bring an action against the defendants personally and in their official capacity. Plaintiffs seek to redress and enjoin violations of rights secured to them by the Fourteenth Amendment and by 42 U.S.C. §§ 1981, 1983 and 1988, specifically the discrimination on grounds of race in hiring, and in employee assignments and promotions. Injunctive and other appropriate legal and equitable relief, including back pay, are sought.

Defendants contend that plaintiffs are not entitled to relief under §§ 1981, 1983 and 1988 because their actions, individually as well as in their official capacity, are cloaked with immunity. Defendants further contend that the Fourteenth Amendment is not available for relief in this suit since plaintiffs are seeking monetary damages.

### Official Capacity

Under section 1983, "every person who, under color of any statute," deprives another of his civil rights, "shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." This section imposes liability on state officials for acts done, either within or without the scope of their authority. Monroe v. Pape, 365 U.S. 167, 171–187, 81 S.Ct. 473, 5 L.Ed. 2d 492 (1961).

■ Ever since Ex parte Virginia, 100 U.S. 339, 346–347, 25 L.Ed. 676 (1880), it has been universally recognized that Congress has the power to enforce provisions of the Fourteenth Amendment against those who carry a

badge of authority of a state and represent it in some capacity, whether they act in accordance with their authority or misuse it. The question posed before this court, however, is whether Congress, in enacting section 1983, intended to hold liable a municipal or governmental agency for the acts of its officials or representatives in the deprivation of the civil rights of others. Disregarding possible Eleventh Amendment arguments, which will be discussed later, it is the opinion of this court that Congress did not undertake to bring municipal or governmental agencies within the ambit of section 1983. For purposes of this section, a municipal corporation or government body or agency, is not a "person" subject to suit. *E. g.*, Monroe v. Pape, *supra*, 365 U.S. at 187–192, 81 S.Ct. 473; Whitner v. Davis, 410 F.2d 24, 29 (9th Cir. 1969); Williford v. California, 352 F.2d 474, 476 (9th Cir. 1965); King v. McGinnis, 289 F.Supp. 466, 468 (S.D.N.Y.1968); United States ex rel. Gittlemacker v. Pennsylvania, 281 F.Supp. 175, 178 (E.D.Pa.1968).

As a corollary to this rule, when a suit is lodged against a public official with the intent and purpose of obtaining a judgment which will establish a liability on the state and will be payable out of the public funds of the state, the suit is in actuality "one against the State, even though the State is not named as a defendant." Westberry v. Fisher, 309 F. Supp. 12, 18 (S.D.Me.1970). *See* Kennecott Copper Corp. v. State Tax Commission, 327 U.S. 573, 576–577, 66 S.Ct. 745, 90 L.Ed. 862 (1946); Ford Motor Co. v. Department of Treasury of Ind., 323 U.S. 459, 463–464, 65 S.Ct. 347, 89 L.Ed. 689 (1945); Great Northern Life Ins. Co. v. Read, 322 U.S. 47, 51, 64 S.Ct. 873, 88 L.Ed. 1121 (1944).

■ As was stated in Minnesota v. Hitchcock, 185 U.S. 373, 387, 22 S.Ct. 650, 656, 46 L.Ed. 954 (1902), " * * * whether a suit is one against a state is to be determined, not by the fact of the party named as defendant on the record, but by the result of the judgment or decree which may be entered. * * * "

Accordingly, to the extent that this action is directed against the Commissioners in their official capacity, this suit would be against the Washington Suburban Sanitary Commission, a governmental body created by the Maryland Legislature. Congress intended section 1983 to render certain officials *personally* liable for their actions and not to provide a damage action against the state itself. Cuiksa v. City of Mansfield, 250 F.2d 700 (6th Cir. 1957); Agnew v. City of Compton, 239 F.2d 226 (9th Cir. 1956); Cobb v. City of Malden, 202 F.2d 701 (1st Cir. 1953); Charlton v. City of Hialeah, 188 F.2d 421 (5th Cir. 1951).

This conclusion was emphatically stated by Justice Douglas in *Monroe, supra*,

[t]he response of the Congress to the proposal to make municipalities liable for certain actions being brought within federal purview by the Act of April 20, 1871, was so antagonistic that we cannot believe that the word "person" was used in this particular Act to include them. *Id.*, 365 U.S. at 191, 81 S.Ct. at 486.

Later cases have followed the *Monroe* principle and rejected damage claims against a *state* in *Williford, supra*, and a *county* in Diamond v. Pitchess, 411 F.2d 565 (9th Cir. 1969). *Accord* Brown v. Town of Caliente, Nevada, 392 F.2d 546 (9th Cir. 1968); Fisher v. City of New York, 312 F.2d 890 (2d Cir.), cert. denied 374 U.S. 828, 83 S.Ct. 1866, 10 L.Ed. 2d 1051 (1963); Eisen v. Eastman, 421 F.2d 560 (2d Cir. 1969); Westberry v. Fisher, *supra*; State of Tenn. ex rel. Davis v. Hartman, 306 F.Supp. 610 (E.D.Tenn.1969); Johnson v. Hackett, 284 F.Supp. 933 (E.D.Pa.1968); Baxter v. Parker, 281 F.Supp. 115 (N.D.Fla. 1968).

■ In their official capacities, the Commissioners are extensions of the municipal agency and are, therefore, not "persons" within the meaning of section 1983. Accordingly, damages may not be assessed against the defendants under this section for acting in their official capacities.

212

## Individual Capacity

As noted above, section 1983 was designed to render a person acting under color of any statute who deprived another of his civil rights, personally liable for their actions. One exception to holding an individual personally liable is if his acts are privileged or fall into an immunity category.

 The language of section 1983 is cast in terms so broad as to indicate that governmental immunity can never be a defense in suits brought under that section. As Judge Magruder observed in his concurring opinion in Cobb v. City of Malden, supra, 202 F.2d at 705–706, the literal language of the statute

> * * * seems to say that every person in official position, whether executive, legislative, or judicial, who under color of state law subjects or causes to be subjected any person to the deprivation of any rights secured by the Constitution of the United States, shall be liable in damages to the person injured. The enactment in terms contains no recognition of possible defenses, by way of privilege, even where the defendants may have acted in good faith, in compliance with what they believe to be their official duty.

Despite the broad sweep of the statutory language, it has not been authoritatively determined that it was the intention of Congress in enacting section 1983 "to abolish wholesale all common law immunities." Pierson v. Ray, 386 U.S. 547, 554, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967). Quite the contrary. *Pierson* seems to have laid to rest any doubt that the defense of common law immunities will not be applicable to actions arising under section 1983. The Supreme Court had held previously in Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), that section 1983 did not abrogate the immunity of legislators for acts done within their legislative role. *Pierson* specifically held that judges are entitled to immunity from suit for acts done in discharge of their judicial functions. While the Supreme Court has granted the defense of absolute immunity to legislators and judges for acts done in discharging their official duties, lower federal courts have extended this immunity to a wide variety of judicial and quasi-judicial officers, including clerks of court, justices of the peace, prosecuting attorneys, and sometimes even governors, jailers, and parole board members. *See, e. g.,* Brown v. Dunne, 409 F.2d 341 (7th Cir. 1969); Sullivan v. Kelleher, 405 F.2d 486 (1st Cir. 1968); Fanale v. Sheehy, 385 F.2d 866 (2d Cir. 1967); Rhodes v. Meyer, 334 F.2d 709 (8th Cir.), cert. denied, 379 U.S. 915, 85 S.Ct. 263, 13 L.Ed.2d 186 (1964); Kenney v. Fox, 232 F.2d 288 (6th Cir.), cert. denied, Kenney v. Killian, 352 U.S. 855, 77 S.Ct. 84, 1 L.Ed. 2d 66 (1956); Delaney v. Shobe, 235 F. Supp. 662 (D.Or.1964).

 The Supreme Court has not definitively spoken on the applicability of the doctrine of governmental immunity in actions brought under section 1983 against local governmental agency officials, such as the defendants in this case. Nevertheless, while such officials may not be entitled to the absolute immunity which has been accorded to all legislators and judges, they are still entitled to a limited or a qualified immunity. This interpretation is in accordance with the general intent and tenor of the Act. As was stated in Jobson v. Henne, 355 F.2d 129, 133 (2d Cir. 1966), "to hold all state officers immune from suit would very largely frustrate the salutary purpose of this provision." But to take away all immunity would seem to give the section a meaning that Congress did not intend. *See* Hoffman v. Halden, 268 F.2d 280, 300 (9th Cir. 1959). In *Cobb, supra,* the court stated

> a roughly accurate generalization that members of a city council, and other public officers not in the exceptional category of officers having complete immunity, would have a qualified privilege, gives them a defense against civil liability, for harms caused by acts done by them in good faith in per-

formance of their official duty as they understood it. *Id.,* 202 F.2d at 707.

The Court in *Pierson,* in addition to reaffirming the common law immunity of judges, specifically held that the defense of *good faith* and *probable cause* was available in an action under section 1983 to police officers who had arrested the petitioners, acting under a statute which was subsequently held to be unconstitutional but which the officers had probable cause to believe was valid. 386 U.S. at 555–557, 87 S.Ct. 1213. The Court thus made it clear that state officers, although not entitled to an absolute and unqualified immunity, have at least a limited immunity for acts done by them in *good faith* within the scope of their official duties. Good faith and probable cause are defenses not because of any language in section 1983, but because section 1983 must be read in a manner consistent with the background of common law immunities.

In *Cobb,* Judge Magruder stated that "the Act merely expresses a prima facie liability, leaving to the courts to work out, from case to case, the defenses by way of official privilege which might be appropriate to the particular case." 202 F.2d at 706. In Francis v. Lyman, the learned judge said that "we think it no longer appropriate" to "give effect to the statute in its literal wording," 216 F.2d 583, 587 (1st Cir. 1954); instead, it is the duty of the court to "fit the statute as harmoniously as may be into the familiar and generally accepted legal background, and to confine its application, within reason, to those situations which might possibly have had the approval of the Congress if it had specifically adverted to the particular cases, bearing in mind the basic purposes which gave rise to the legislation in the first place." *Id.* at 587.

This interpretation of section 1983 by Judge Magruder was the one adopted more than ten years later by the Supreme Court in *Pierson.* *See also* 3 Davis, Administrative Law Treatise, § 26.06 (1958); Jaffe, Suits Against Governments and Officers: Damage Ac-

tions, 77 Harv.L.Rev. 209, 221–22 (1963); Note, The Doctrine of Official Immunity under the Civil Rights Act, 68 Harv.L.Rev. 1229, 1238–40 (1955); Note, The Proper Scope of the Civil Rights Act, 66 Harv.L.Rev. 1285, 1295–99 (1953). Other courts, both before and subsequent to *Pierson,* have enunciated similar tests. *See, e. g.,* Silver v. Dickson, 403 F.2d 642 (9th Cir. 1968), cert. denied, 394 U.S. 990, 89 S.Ct. 1477, 22 L.Ed.2d 765 (1969); Franklin v. Meredith, 386 F.2d 958, 960–961 (10th Cir. 1967); Hoffman v. Halden, *supra,* 268 F.2d at 298–300. *Cf.* Barr v. Matteo, 360 U.S. 564, 573, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959).

■ Defendants urge this court to absolve them of any liability because their actions were within the discretion of their office. Under the common law, public officials have traditionally been immune from personal liability when exercising the discretion which their office both permits and demands. *See* Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959); Jaffe, Suits Against Governments and Officers: Damage Actions, 77 Harv.L.Rev. 209 (1963). Maryland has adopted this common law rule providing for discretionary immunity for public officials. *See* Carder v. Steiner, 225 Md. 271, 170 A.2d 220 (1961); State to Use of Clark v. Ferling, 220 Md. 109, 151 A.2d 137 (1959).

This immunity for public officials is founded on persuasive policy considerations. If personal liability could be found for decisions made on behalf of the public this would tend to discourage citizens from entering public life. More importantly, personal liability could adversely affect the quality of public decision-making itself. Under the spector of such liability, officials would be encouraged to choose only those paths providing maximum protection with the public interest becoming a secondary consideration. *See* The Proper Scope of the Civil Rights Acts, 66 Harv.L.Rev. 1285, 1295 (1953). Because of these inherent dangers, courts have been reluctant to cast

aside common law immunities. *See* Tenney v. Brandhove, *supra*; Sullivan v. Kelleher, *supra*; Westberry v. Fisher, *supra*. But this reluctance to cast aside a public official's discretionary immunity does not guarantee that public officials will be absolved of all liability. To do so would rule nugatory the provisions of section 1983. *Jobson, supra.*

■■■■ While good faith in the exercise of discretionary functions may be a valid defense to an assertion of individual liability, Silver v. Dickson, 403 F.2d 642 (9th Cir. 1968), the mere recitation is not enough to be an absolute defense. Only by a clear showing from all the facts that the defendants acted in good faith in the exercise of their discretion, will this defense lie. Good faith is a distillation and evaluation of a large number of facts. This court feels, however, that as a matter of law and public policy, where "racial discrimination" is practiced, good faith cannot be interjected as a valid defense.

■■■■ The discretionary exception goes to judgment decisions on the part of public officials. It is not necessary to show an improper motive on the part of the person charged under the section. Whirl v. Kern, 407 F.2d 781 (5th Cir. 1969). An inference may be drawn from the surrounding facts that good faith does not lie. The decisions of the Supreme Court have repeatedly noted that a complaint under the Civil Rights Act should not be dismissed for failure to state "a specific intent to deprive a person of a federal right." Pierson v. Ray, *supra*; Monroe v. Pape, *supra*. It is the deprivation of the individual's rights that causes a violation of the Act.

The practice of racial discrimination cannot be cloaked in the discretionary immunity exception. To hold an individual liable under this section for participating in acts of racial discrimination is to carry out the intent and tenor of the Act. The purpose with which an unconstitutional act is done is relevant to recovery under section 1983 but relevant more as a source of defenses going to good faith and probable cause. Both these defenses of good faith and probable cause are not applicable where racial discrimination is proven. Courts have been reluctant to grant immunity where the acts of officials have clearly gone beyond the scope of their duties. Two recent cases have declined to find good faith or probable cause, and hence immunity, where police officers made arrests without a warrant or probable cause, Joseph v. Rowlen, 402 F.2d 367 (7th Cir. 1968), and where they failed to promptly release a prisoner after all charges were dismissed, Whirl v. Kern, *supra*. Because the issue of whether the defendants have participated in any acts of racial discrimination will have to be decided at trial, this court cannot dismiss this part of the complaint.

■■■■ As stated above, section 1983 applies solely to an individual who is acting under color of state statute. Liability will only lie where it is affirmatively shown that the official charged acted personally in the deprivation of the plaintiffs' rights. The doctrine of *respondeat superior* has no application under this section. *Monroe, supra*; Jordon v. Kelly, 223 F.Supp. 731 (W.D.Mo. 1963). In dismissing the complaint in Sanberg v. Daley, 306 F.Supp. 277 (N.D. Ill.1969), the court held as follows:

> The doctrine of *respondeat superior* has no place under the civil rights statutes for "[p]ersonal involvement is contemplated." Salazar v. Dowd, 256 F.Supp. 220, 223 (D.Colo.1966). Premised on personal culpability, these statutes are aimed at those who subject others to a deprivation of their constitutional rights, rather than at the state or city which employs them or the officials with ultimate authority over them in the governmental hierarchy. *Id.* at 278.

To be liable under this section, plaintiffs must prove that the defendants directed or personally participated in the deprivation of plaintiffs' rights. Only personal involvement is contemplated by this section. Plaintiffs, therefore, at trial, in order to hold the defendants accountable, will have to show that the Commission-

ers directly participated in the alleged acts of racial discrimination in the hiring, assigning, promoting and conditions of employment.]

 If defendants are found guilty of racial discrimination in their individual capacity under section 1983, plaintiffs will be entitled to any remedy at law or equity, as this court may deem appropriate, including the recovery of monetary damages. Basista v. Weir, 340 F.2d 74 (3d Cir. 1965); Marshall v. Sawyer, 301 F.2d 639 (9th Cir. 1962); Davis v. Board of Trustees of Ark. A & M College, 270 F.Supp. 528 (E.D.Ark.), aff'd, 396 F.2d 730 (8th Cir. 1967); Rhoads v. Horvat, 270 F.Supp. 307 (D. Colo.1967).

### Sections 1981 and 1988

 In the amendment to the complaint and the complaint in intervention, plaintiffs first raised sections 1981 and 1988 as a basis for claiming promotion related damages. Insofar as plaintiffs seek to utilize these sections to impose liability in the nature of monetary damages upon a government entity, their claim must be denied.

Sections 1981 and 1988, like 1983, were designed to hold individuals liable for infringing upon another's civil rights. In 1871, when Congress was debating the merits of section 1983, section 1981 had already been law for five years and had been repassed the previous year. In its consideration of section 1983, Congress specifically rejected a proposal to hold municipalities liable for the acts of its officials in depriving persons of their civil rights. The reason for rejecting this proposal was not that such liability already existed under section 1981, but that imposing this type of liability upon the community was antagonistic to the basic policies of Congress. Cong.Globe, 42 Cong. 1st Sess. 800–04. *See also* Monroe v. Pape, *supra*, for an informative review of the history of the Civil Rights Act of 1871.

As clearly indicated in the legislative history, the primary purpose of section 1983 was to provide a federal remedy otherwise unavailable for asserting damages for deprivation of civil rights. Basista v. Weir, *supra*; San Mateo Cty. v. Southern Pac. R. R., 13 F. 145 (9th Cir. 1882); Cong.Globe, 42 Cong. 1st Sess. 345. Accordingly, an interpretation of section 1981 which authorizes damage actions against states and municipalities deprives section 1983 of its essential significance.

That a cause of action under sections 1981 and 1988 could be lodged against a private individual and not necessarily one acting under color of state title was pointed out in Scott v. Young, 421 F.2d 143 (4th Cir. 1970), cert. denied, 398 U.S. 929, 90 S.Ct. 1820, 26 L.Ed.2d 91 (1970). Recent decisions have held that since both sections 1981 and 1982 were originally enacted as part of the same sentence of section 1 of the 1866 Act, the broad scope of section 1982 should be taken with respect to section 1981 as well. Scott v. Young, *supra*. *See also* Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969); Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968); Bush v. Kaim, 297 F.Supp. 151 (E.D.Ohio 1969). In *Jones*, the Supreme Court declared that section 1982 (enacted in the 1870 Civil Rights Act) authorized injunctive relief for discrimination in private transactions. The case did not involve any question of damages and the Court specifically refused to speculate on that issue. 392 U.S. at 414 note 14, 88 S.Ct. 2186. In *Sullivan*, the Court faced the damage issue left unresolved in *Jones* and ruled that, under sections 1982 and 1988, private parties may be held liable for damages arising from the violation of certain civil rights. This approach provides a remedy comparable to the remedy available against public officials under section 1983.

 That section 1981 applies to employment contracts is not in doubt. *E. g.*, Waters v. Wisconsin Steel Works of Int'l Harvester Co., 427 F.2d 476 (7th Cir. 1970); Clark v. American Marine Corp., 304 F.Supp. 603 (E.D.La.1969).

But the relief is against a private individual and not a government entity. Only one case since the passage of section 1981 has allowed a damage action to be permitted against a government entity. United States ex rel. Washington v. Chester Cty. Police Dept., 300 F.Supp. 1279 (E.D.Pa.1969). In that case, the district court permitted a damage action to compensate plaintiff for damages arising from an incident of severe police brutality. After focusing on the remedial authority under section 1981, the court emphasized the "mandate of section 1988" to incorporate state common law to vindicate civil right violations. The court's specific conclusion was as follows: "[i]n view of the fact that an action for damages will lie for battery at common law, and that the rule in Pennsylvania is no different, we hold that a plaintiff may recover damages where a defendant commits a battery in violation of the plaintiff's rights under section 1981. 42 U.S.C. §§ 1981 and 1988." 300 F.Supp. at 1282. Other courts have specifically denied this type of relief. E. g., Hirych v. State, 376 Mich. 384, 136 N.W.2d 910 (1965); Watson v. Devlin, 167 F.Supp. 638 (E.D. Mich.1958), aff'd, 268 F.2d 211 (6th Cir. 1959). It is this court's opinion that *Chester County* should be limited to its facts and that a cause of action against a municipality under these sections will not lie unless there is a clear showing that the government entity is susceptible to a state suit for damages. However, an action for damages or equitable relief will lie against the defendants in their personal or individual capacity.

### Fourteenth Amendment

Because sections 1981, 1983 and 1988 do not provide a remedy against a municipality or municipal agency, plaintiffs have also brought an action against the defendants in their official capacity, as agents of the WSSC, for damages and injunctive relief based upon the Fourteenth Amendment. Defendants have asserted that this action is barred by the Eleventh Amendment since it is in actuality a suit against a state. As an alternative, defendants contend the action will not lie because the Fourteenth Amendment does not grant the recovery of monetary damages.

The Eleventh Amendment to the Constitution provides

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

Although the Eleventh Amendment by its terms prohibits only federal court suits against a state by citizens of another state, it has long been established that a state is equally immune from federal court suits brought by its own citizens. Parden v. Terminal Ry., 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964); Great No. Life Ins. Co. v. Read, 322 U.S. 47, 64 S.Ct. 873, 88 L.Ed. 1121 (1944); Fitts v. McGhee, 172 U.S. 516, 19 S.Ct. 269, 43 L.Ed. 535 (1899); Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). *See generally*, Comment, Private Suits Against States in the Federal Courts, 33 U.Chi.L.Rev. 331 (1966).

But while the Eleventh Amendment prohibits the use of federal courts in suits against a state without its consent, this prohibition does not extend to a municipality or a municipal agency. Graham v. Folsom, 200 U.S. 248, 26 S.Ct. 245, 50 L.Ed. 464 (1906); Lincoln County v. Luning, 133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766 (1890); Chesapeake Bay Bridge & Tunnel Dist. v. Lauritzen, 404 F.2d 1001 (4th Cir. 1968); Atkins v. City of Charlotte, 296 F.Supp. 1068 (W. D.N.C.1969); Brown v. Marshall Cty., Ky., 394 F.2d 498 (6th Cir. 1968); N. M. Paterson & Sons, Ltd. v. City of Chicago, 176 F.Supp. 323 (E.D.Ill.1959); James v. Duckworth, 170 F.Supp. 342 (E.D.Va.), aff'd, 267 F.2d 224 (4th Cir.), cert. denied, 361 U.S. 835, 80 S.Ct. 88, 4 L.Ed.2d 76 (1959). As was stated in Hopkins v. Clemson Agricultural Col-

lege of S. C., 221 U.S. 636, 645, 31 S.Ct. 654, 657, 55 L.Ed. 890 (1911)

> But neither public corporations nor political subdivisions are clothed with that immunity from suit which belongs to the state alone by virtue of its sovereignty.

The defense, therefore, of the Eleventh Amendment cannot be used by the WSSC to dismiss an action brought pursuant to the Fourteenth Amendment.

■ The WSSC is the governing body of the Washington Suburban Sanitary District, a public agency created by the State of Maryland (Chapter 122 of the Acts of 1918) for the provision and maintenance of public water and sewerage facilities in Prince George's and Montgomery Counties. The Commission is a governmental unit possessing the power of eminent domain and a limited power of taxation. Its bonds are backed by the full faith and credit of the two counties it primarily serves. It relies upon public revenues for its financial support. Its Commissioners are each appointed by the governing bodies of either Prince George's or Montgomery Counties. The actions of the Commission or of the Commissioners acting in their official capacity are therefore actions of the State of Maryland within the meaning of the Fourteenth Amendment.

But plaintiffs' action against the WSSC pursuant to the Fourteenth Amendment entitles them only to injunctive relief and not monetary damages. The Fourteenth Amendment does not itself provide a basis for a civil action for damages. Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Injunctive or equitable relief has long been considered the only appropriate remedy for violations of the rights afforded in the Fourteenth Amendment. *Westberry, supra*; Bell v. Hood, 71 F. Supp. 813 (S.D.Cal.1947). Plaintiffs argue strenuously, however, that the Fourteenth Amendment provides the basis for the recovery of damages against the state. To date, however, the Supreme Court has not seen fit to extend the doc-

trine of *Ex parte Young* to permit the recovery of monetary damages. *Westberry, supra*; Fisher v. City of New York, 312 F.2d 890 (2d Cir.), cert. denied, 374 U.S. 828, 83 S.Ct. 1866, 10 L. Ed.2d 1051 (1963); Stanturf v. Sipes, 335 F.2d 224 (8th Cir.), cert. denied, 379 U.S. 977, 85 S.Ct. 676, 13 L.Ed.2d 567 (1964); Scolnick v. Winston, 219 F. Supp. 836 (S.D.N.Y.1963), aff'd, 329 F. 2d 716 (2 Cir.), cert. denied, 379 U.S. 825, 85 S.Ct. 49, 13 L.Ed.2d 35 (1964). In *Bell*, the court made the observation that the mere enactment of 42 U.S.C. § 1983, which specifically provides for a damage remedy at law, "strongly indicates that Congress did not regard the Constitution itself as providing a cause of action to individuals whose rights thereunder are violated." 71 F.Supp. at 819.

In those cases in which the recovery of money from the state's treasury has been sought, courts have consistently adhered to the rule that a state cannot be sued in a federal court without its consent. Kennecott Copper Corp. v. State Tax Commission, 327 U.S. 573, 66 S.Ct. 745, 90 L.Ed. 862 (1946); Whitner v. Davis, 410 F.2d 24 (9th Cir. 1969); DeLevay v. Richmond Cty. School Bd., 284 F.2d 340 (4th Cir. 1960); O'Neill v. Early, 208 F.2d 286 (4th Cir. 1953); Bell v. Hood, *supra*.

The rationale for prohibiting the recovery of monetary damages is that an official who is acting unconstitutionally is acting beyond the authority of the government and any applicable damage actions relate to these officials as individuals. Koch v. Zuieback, 316 F.2d 1 (9th Cir. 1963); Davis, Suing the Government by Falsely Pretending to Sue an Officer, 29 U.Chi.L.Rev. 435 (1962).

Several recent welfare cases, however, have extended coverage and awarded damages in the form of retroactive payments of benefits wrongfully withheld. E. g., Thompson v. Shapiro, 270 F.Supp. 331 (D.Conn.1967), aff'd sub nom, Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Gaddis v. Wyman, 304 F.Supp. 717 (S.D.N.Y.

1969). But the award of damages when granted, has been limited solely to these welfare cases where the court has attempted to accomplish restitution.

Plaintiffs also rely upon Markham v. City of Newport News, 292 F.2d 711, 716–717 (4th Cir. 1961) and Brown v. Marshall Cty., Ky., 394 F.2d 498 (6th Cir. 1968). These cases sought equitable relief which had a commensurate effect of having a substantial monetary impact. This court recognizes that the expense of abiding by an injunction or accomplishing restitution may be costly. Yet these cases do not indicate that the Fourteenth Amendment authorizes a civil action at law for damages. It is not incumbent upon this court to change long-standing precedent. We therefore hold that plaintiffs, if successful at trial in their action under the Fourteenth Amendment, will be entitled solely to equitable relief.

### Class Action

Defendants further contend that this suit should be dismissed as to the class action brought by the plaintiffs. Their claim rests on the belief that the remedies sought are inappropriate for a class action. No challenge, however, is made to the plaintiffs' contention that (1) the class is so numerous that joinder of all its members is impracticable; (2) that there are questions of law and fact common to the class; (3) that the claims of the representative parties are typical of the claims of the class; or (4) that plaintiffs will fairly and adequately protect the interests of the class. Nor is there a challenge that the questions of law or fact do not predominate over questions affecting only individual members and that a class action is not superior to other available methods for the fair and efficient adjudication of the controversy. Plaintiffs contend that the defendants have acted and refused to act on grounds applicable to the class as a whole, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the class as a whole.

Class actions have long been used successfully against segregation. E. g., Brown v. Board of Educ., 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). The use of class actions is appropriate inasmuch as racial discrimination is by definition a class discrimination, even though individual rights are involved. E. g., Lance v. Plummer, 353 F.2d 585 (5th Cir. 1965), cert. denied, 384 U.S. 929, 86 S.Ct. 1380, 16 L.Ed.2d 532 (1966); Potts v. Flax, 313 F.2d 284 (5th Cir. 1963); Hall v. Werthan Bag Corp., 251 F.Supp. 184 (M.D.Tenn.1966).

Rule 23 of the Federal Rules was amended in 1966 to make access to class actions easier for litigating plaintiffs. Professor Moore indicates that the addition of (b) (3) in the 1966 amendments was to remove all doubts about the propriety of class actions where individual damages are involved.

> Under the old Rule, a "spurious" class suit could only be brought if the class members were seeking a common relief. For purposes of new Rule 23(b) (3), the essential elements are the predominance of common questions and superiority of the class action as the method of adjudication and variations in the relief sought by particular class members may not always be relevant.
>
> \* \* \* \* \* \*
>
> Subdivision (b) (3) \* \* \* looks to the existence of a group defined by the dependence of the individual members on the determination of common issues; any relief ultimately granted may vary among the class members.

3B J. Moore, Federal Practice ¶ 23.45 [1], at 23–702, 703 (2d ed. 1969).

In determining whether a class action will lie, a court must look to see whether the actual interests of the parties will be better served by the attempt to conclude, in one common question class suit all matters of difference between them. The fundamental question to decide is whether the group aspiring to class status is seeking to remedy a common legal grievance. It is this court's opinion that a class action is appropriate in this proceeding.

The common question is whether the defendants individually as well as in their official capacity, practiced discrimination against the plaintiffs' race. The relief sought will inure to all members of plaintiffs' race. To have a piecemeal litigation on this issue would put an onerous burden upon this court.

The appropriateness of class relief and the methods necessary to effectuate it are problems difficult to resolve at this stage of the proceeding. If different types of discrimination are shown to exist, different types of individual relief may be called for. But the need to grant different types of remedies does not mean this is not a proper suit for a class action. If discriminatory practices are shown to exist, this court may divide the class into sub-classes for the purpose of relief, as contemplated by Rule 23(c)(4). Plaintiffs, therefore, may maintain this suit as a class action.

## DENIAL OF EMPLOYMENT

 Linda F. Lewter, is suing through her father and next friend, Pierce C. Lewter, Jr., for allegedly being denied employment with the WSSC solely because of her race. Insofar as plaintiff seeks monetary damages under sections 1981, 1983 and 1988 against the defendants acting in their official capacity on monetary damages under the Fourteenth Amendment against the WSSC, these claims must be denied for the reasons already enumerated above. However, if at trial it is shown that plaintiff was denied employment with the WSSC solely because of her race, she will be entitled to equitable relief against the WSSC under the Fourteenth Amendment and both legal and equitable relief against the defendants acting in their individual capacities under sections 1981, 1983 and 1988.

Defendants' motion for dismissal shall therefore be granted as to those plaintiffs discharged for failure to return to work after engaging in the illegal walkout on March 6, 1970. Defendants' motion for dismissal as to the four current employees of the WSSC and as to Linda F. Lewter, suing through her father, for allegedly being denied employment solely because of her race, shall be denied for those reasons listed above.

Defendants' motion for dismissal shall therefore be granted as to James P. Bennett, Bernard E. Bobbitt, Leonard Boswell, Paine L. Bowman, Ronald C. Briscoe, I. J. Brooks, Luther C. Bynum, Howard W. Cooper, Marc G. Gurvitch, Victor E. Savoy, Lloyd C. Walker, Ronald Washington, Charles S. Williams, Ray Williams, Jr., Francis N. Young, Richard T. Young, John W. Boswell, Sylvester Bradley, Oliver A. Carroll, Nathaniel Jimason, Arthur Jordon, Jr., George J. Proctor, Thomas G. Proctor, Larry L. Savoy, James M. Talbert, Bobby R. Williams, Wayne L. Bowman, John S. Gray, and William O. Hartsfield, plaintiffs discharged for failure to return to work after engaging in the illegal walkout on March 6, 1970. Defendants' motion for dismissal as to Carl A. Brown, Pierce C. Lewter, Jr., Arthur J. Bell and Tommie Gilchrist, current employees of the WSSC and as to Linda F. Lewter, shall be denied for those reasons listed above.