**James FRANCIS**

v.

**Arthur T. LYMAN et al.**

**No. 4842.**

United States Court of Appeals,
First Circuit.

Nov. 9, 1954.

Isadore H. Y. Muchnick, Boston, Mass., for appellant.

Joseph H. Elcock, Jr., Asst. Atty. Gen., of Massachusetts, with whom George Fingold, Atty. Gen., was on the brief, for Arthur T. Lyman et al., appellees.

Joseph M. Hargedon, Boston, Mass., John C. Reardon and Edward L. Lanigan, Lawrence, Mass., on the brief, for James A. Donovan, appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

In an action for $500,000 damages under the Civil Rights Act, 8 U.S.C. (1946 ed.) § 43,[1] brought against an assorted group of public officials of the Commonwealth of Massachusetts, the district court entered judgment on February 26, 1954, dismissing the complaint as to each of the remaining defendants for failure of the plaintiff to state a claim upon which relief could be granted. The plaintiff thereupon took this appeal.

Prior to March 19, 1940, appellant James Francis, then 17 years of age, was a voluntary inmate of the Walter E. Fernald State School for the feeble-minded. On March 19, 1940, following the procedure outlined in Ch. 123, Mass. G.L. (Ter.Ed.) §§ 113–116, Hon. Frederic A. Crafts, in his capacity as Special Justice of the Second District Court of Eastern Middlesex, Massachusetts, a state court of general jurisdiction, issued an order for the removal of Francis as a defective delinquent to the custody of the Department for Defective Male Delinquents. The order in question, after reciting that the provisions of Mass.G.L., Ch. 123, § 115, respecting the filing of a certificate by two physicians, had been complied with, and that it further appeared "to said Court after a full hearing in the premises that said defendant is now mentally defective and not a proper subject for a school for the feeble-minded", commanded the superintendent of the Bridgewater State Farm (being then the defendant James E. Warren) to receive the said Francis "and him there safely keep in your custody according to the rules of said Department or until he be otherwise discharged in due course of law." Francis was confined at the Bridgewater State Farm pursuant to said order of commitment for several years, after which he was by administrative action transferred to the Massachusetts Reformatory at Concord, where he remained incarcerated until he was released in 1951 as the result of a petition for a writ of habeas corpus addressed to the Superior Court for the County of Suffolk. It was the theory of the habeas corpus application, which the Superior Court accepted, that the order of commitment was void under the due process clause of the Fourteenth Amendment, for failure of Judge Crafts to afford to Francis, the defendant in the proceeding, or to his natural guardian in his behalf, adequate notice and opportunity to be heard. The statute, as it read at this time, Ch. 123, § 116, merely required that the judge "shall make inquiry into the facts", not that such inquiry should be restricted to evidence produced at a hearing upon due notice to the defendant and opportunity to be heard; however, the statute did not forbid such a hearing if the court should choose to have one.

The complaint in the present case, under the Civil Rights Act, named Judge Crafts as one of the defendants. At an earlier stage of the proceeding the district court entered a separate "final judgment", under Rule 54(b), Fed.Rules Civ.Proc. 28 U.S.C., dismissing the complaint as to Judge Crafts. D.C., 108 F. Supp. 884. On appeal we affirmed that judgment, on the ground that the Civil Rights Act should not be interpreted as overturning the time-honored immunity of judges from civil liability for their official acts, in the absence of an express declaration of legislative intention to that effect. Francis v. Crafts, 1 Cir., 1953, 203 F.2d 809. Certiorari was applied for and denied. 1953, 346 U.S. 835, 74 S.Ct. 43.

Now we have, in the present appeal, the cases of the other state officials named as defendants in the complaint. As to most of these officials, it is crystal-clear that the district court did right in dismissing the complaint; these more obvious cases will be mentioned first.

Defendants Arthur T. Lyman, J. Paul Doyle, Elliott E. McDowell, and

Maxwell B. Grossman, are alleged to have held the office of Commissioner of Correction in succession during the period from March 19, 1940, up to the date when Francis was released on habeas corpus. It is alleged that each of these defendants, acting in the capacity of Commissioner of Correction, and vested with full power and obligation to administer and oversee the actions of the superintendents of the various penal institutions, including the State Farm at Bridgewater and the Massachusetts Reformatory at Concord, "failed to release the plaintiff", and thus abetted and condoned the actions of the heads of these institutions in unlawfully restraining Francis of his personal liberty.

 None of these defendants, former Commissioners of Correction, caused the confinement of Francis in denial of his right to due process of law. It is true they failed to order his release; but this was nonfeasance in a situation where the Commissioner had neither the legal duty nor the legal authority to act. The proper procedure for inquiring into the lawfulness of Francis' confinement was by application to a court for a writ of habeas corpus. See Petition of O'Leary, 1950, 325 Mass. 179, 89 N.E.2d 769. That was the procedure whereby the release of Francis was ultimately obtained, by order of the Superior Court. Under Massachusetts law, Mass.G.L.(Ter.Ed.) Ch. 125, the Commissioner of Correction had general supervision of the several state institutions, including power of appointment and removal of the various superintendents thereof, and including supervision of the control of prisoners regularly committed to their charge under court orders of commitment fair and regular on their face. The Commissioner of Correction had no function, like that of the Superior Court on a writ of habeas corpus, to go behind said judicial order of commitment to inquire into the validity of the procedure leading up to its issuance, and to order the superintendent of the confining institution to release the prisoner if the Commissioner determined

that he was held in defiance of his constitutional rights.

As to one of these defendants, McDowell, the complaint contains a further allegation, that on April 27, 1948, in his capacity as Commissioner of Correction, he ordered, for administrative reasons and without prior notice to or consent of the plaintiff, the transfer of the plaintiff from the State Farm to the Massachusetts Reformatory at Concord. Somehow the plaintiff seems to suggest that the order of transfer would make McDowell liable in damages for false imprisonment, even though he might not be liable prior to that date merely because he held the office of Commissioner of Correction during part of the period when Francis was confined at the State Farm in Bridgewater. We do not think that this suggestion is well taken. There was only one continuous confinement, of which Francis complains, namely, his confinement in the Massachusetts penal system as a defective delinquent in consequence of the commitment order issued by Judge Crafts on March 19, 1940. As already indicated, McDowell was not legally responsible for that confinement; and if McDowell was not legally liable for the original commitment to the Massachusetts penal system, he did not become liable because he made a subsequent order, as a matter of administrative detail, transferring the prisoner from one penal institution to another. Francis had no right, secured by the Constitution of the United States, to be confined only at the State Farm in Bridgewater. It was entirely a matter of state law as to which particular penal institution should incarcerate him, which would depend upon an examination of the state statutes and the applicable administrative regulations thereunder.

There is another group of defendants, whom we may deal with collectively; that is, Joseph S. Mitchell, Reuben L. Lurie, J. Robert Ayers, Frederick J. Bradlee, Jr., Harold R. Lundgren, Matthew W. Bullock and James A. Donovan. These defendants are charged in the complaint in their official capacity as

members of the Parole Board at various times during the period in which Francis was confined. The gist of the complaint against these defendants is that, as members of the Parole Board, they failed to inquire into the right of the plaintiff to be released from the alleged unlawful confinement, and that on many occasions they denied applications made by the plaintiff to the Parole Board for release on parole.

■ Naturally, the refusal of these defendants to release Francis on parole resulted in the continuance of his confinement as theretofore. But these defendants were not the legal cause of the continuous confinement of Francis pursuant to the original order of commitment. As in the case of the former Commissioners of Correction, the failure of the members of the Parole Board to order the release of Francis on the ground that he had been committed in defiance of his constitutional rights was mere nonfeasance in a situation wherein the Parole Board had neither the legal duty nor the legal authority to act. The Parole Board had no function to go behind the commitment order issued by Judge Crafts and to inquire into the original lawfulness of the confinement. It had the function of considering applications by a prisoner for release on parole, and of granting such applications if satisfied that the prisoner was a fit subject for parole under the conditions laid down by law. See Mass.G.L.(Ter. Ed.) Ch. 123, §§ 118, 118A. Whether the various applications by Francis for release on parole met these conditions precedent, so that the Parole Board ought to have ordered his release on parole, cannot be determined from the allegations of the complaint. Of course, the right of a convicted prisoner to be released on parole is not a right secured by the Constitution of the United States, but is a matter entirely of state law. The present complaint makes no allegations which would sustain a claim of denial of equal protection of the laws. Snowden v. Hughes, 1944, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497; Everlasting Develop-

ment Corp. v. Sol Luis Descartes, 1 Cir., 1951, 192 F.2d 1, 7, certiorari denied 1952, 342 U.S. 954, 72 S.St. 626, 96 L. Ed. 709. This possibility may therefore be laid to one side.

■ There remain for consideration the cases of two additional defendants named in the complaint, James E. Warren, who in the capacity of superintendent of the State Farm at Bridgewater received Francis on March 19, 1940, pursuant to the judicial warrant of commitment, and who retained Francis in custody at that institution until his transfer by administrative action to the Massachusetts Reformatory at Concord, and John C. Dolan, who in his capacity as superintendent of the Massachusetts Reformatory retained the plaintiff in custody at that institution until his release from confinement pursuant to the writ of habeas corpus in November, 1951. We do not pretend that it is easy to explain why these two defendants are not liable in damages within the coverage of the federal tort liability imposed by the Civil Rights Act. Yet we are clear that the judgment of the district court ought to be affirmed in dismissing the complaint as to these two defendants also, for failure of the complaint to state a claim against them upon which relief could be granted.

As is well known, the statute in question was originally enacted by the Congress in the turbulent days of Reconstruction. For many years the enactment remained on the books, in a somewhat dormant state; and the Congress has never taken occasion to revise or modify the statutory language substantially. It may be that this is to be explained by the fact that until recent years resourceful plaintiffs' lawyers have not sought, in a significant number of cases, to invoke the application of the Civil Rights Act in situations far removed from those which were no doubt predominantly in the minds of the members of Congress in 1871 when they first enacted the legislation. At any rate, the Congress has *sub silentio* retained the act in effect, as it now appears, without

substantial change, in 42 U.S.C.A. § 1983. The corresponding jurisdictional grant to the district courts is found in 28 U.S.C. § 1343(3), as that Title was codified by Congress in 1948.

The section reads as follows:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

In Cobb v. City of Malden, 1 Cir., 1953, 202 F.2d 701, 706, the following observation was made:

"8 U.S.C.A. § 43 seems to say that every person in official position, whether executive, legislative, or judicial, who under color of state law subjects or causes to be subjected any person to the deprivation of any rights secured by the Constitution of the United States, shall be liable in damages to the person injured. The enactment in terms contains no recognition of possible defenses, by way of privilege, even where the defendants may have acted in good faith, in compliance with what they believed to be their official duty. Reading the language of the Act in its broadest sweep, it would seem to make no difference that the conduct of the defendants might not have been tortious at common law; for the Act, if read literally, creates a new federal tort, where all that has to be proved is that the defendants as a result of their conduct under color of state law have in fact caused harm to the plaintiff by depriving him of rights, etc., secured by the Constitution of the United States."

When courts come to deal with a statute phrased in terms of such vague generality, they are faced with two possible alternatives: (1) They may give effect to the statute in its literal wording, and thus reach results so bizarre and startling that the legislative body would probably be shocked into the prompt passage of amendatory legislation. This seems to be the approach which the Third Circuit intended to take in its opinion in Picking v. Pennsylvania R. R. Co., 1945, 151 F.2d 240. (2) The courts may refuse to regard the statute as an isolated phenomenon, sticking out like a sore thumb if given a strict, literal application; and upon the contrary may conceive it to be their duty, in applying the statutory language, to fit the statute as harmoniously as may be into the familiar and generally accepted legal background, and to confine its application, within reason, to those situations which might possibly have had the approval of the Congress if it had specifically adverted to the particular cases, bearing in mind the basic purposes which gave rise to the legislation in the first place. We leave it to others to determine whether such judicial process may fairly be characterized as "interpretation" of the intent of Congress, as disclosed in the statutory language, or whether it is something else. At any rate, it is a function which courts sometimes feel called upon to exercise and indeed which in many cases they are expected to exercise.

From the trend of decisions applying this particular statute, we think it no longer appropriate for this court to proceed in accordance with the first of the above alternatives. See Tenney v. Brandhove, 1951, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019; Cobb v. City of Malden, 1 Cir., 1953, 202 F.2d 701; Francis v. Crafts, 1 Cir., 1953, 203 F.2d 809, certiorari denied 1953, 346 U.S. 835, 74 S.Ct. 43; Wall v. King, 1 Cir., 1953, 206 F.2d 878, certiorari denied 1953, 346 U.S. 915, 74 S.Ct. 275; Cawley v. Warren, 7 Cir., 1954, 216 F.2d 74. See also McGuire v. Todd, 5 Cir., 1952, 198 F.2d 60, 63, certiorari denied 1952, 344 U.S. 835, 73 S.Ct. 44, 97 L.Ed. 649.

Where the act has been invoked in situations which no doubt were a major concern of the Reconstruction Congress—for instance, where members of a state board for the registration of voters have refused to permit the registration of a negro, acting under color of discriminatory state legislation—the Supreme Court has not been loath to impose tort liability upon such state officials under the Civil Rights Act. See Myers v. Anderson, 1915, 238 U.S. 368, 35 S.Ct. 932, 59 L.Ed. 1349; Lane v. Wilson, 1939, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281. There it is no defense to the state officials that they may have acted, not maliciously, but in the good-faith belief that they were performing their official duty under what they thought was valid state legislation. They are said to act at their peril; and if it ultimately turns out on review by the Supreme Court of the United States that the state legislation, under color of which they acted, was unconstitutional under the Fifteenth Amendment, then it is held that they are liable, without more, to an action for damages brought by the excluded negro under the Civil Rights Act. But beyond such situations, it seems to be the tendency of the decisions to restrict the applications of the Civil Rights Act so as to avoid the appalling inflammation of delicate state-federal relationships which undoubtedly would ensue. Cf. Stefanelli v. Minard, 1951, 342 U.S. 117, 121, 72 S.Ct. 118, 96 L.Ed. 138.

We think the gloss put upon the statute by the controlling decisions, if "gloss" is the proper word, is that expressed in Cobb v. City of Malden, 1 Cir., 1953, 202 F.2d 701, 706:

"that the Act merely expresses a prima facie liability, leaving to the courts to work out, from case to case, the defenses by way of official privilege which might be appropriate to the particular case."

In the case at bar, it must now be taken as established that the members of the Massachusetts legislature which enacted the law under which Judge Crafts acted, and Judge Crafts who issued the warrant of commitment under which Francis was confined, are not liable to the plaintiff in damages under 8 U.S.C. § 43, however much the resulting confinement of Francis may have been in violation of his constitutional rights. It then would seem to be a preposterous result if the superintendents of the two penal institutions were held liable in damages for false imprisonment, when all they did, in the line of official duty, so far as is charged in the allegations of the complaint, was to execute in good faith a judicial warrant of commitment issued by a court of general jurisdiction and in all respects fair and regular on its face.

It is a well-known fact that in recent years many convicted state prisoners have been released on habeas corpus directed against the wardens of institutions in which they were confined, on the ground that the state court judgment of conviction and the warrant of commitment pursuant thereto were void because the petitioner had been convicted as a result of some denial of his constitutional rights, as, for example, where the conviction may have been obtained by the use of a coerced confession or by the prosecutor's knowing use of perjured testimony, or where the claim was that the defendant was denied his constitutional right to a reasonable opportunity to obtain and be represented by counsel. In all such cases the warden of the prison may have in good faith confined the prisoner in reliance upon a judicial process, fair and regular on its face, issued by a court of competent jurisdiction. Yet if the present appellant's contention is accepted, it would follow that the release of such a prisoner on habeas corpus would leave the warden defenseless against an action for damages for false imprisonment incident to the confinement of the prisoner prior to the time his right to release had been judicially ascertained. So far as we are aware, a prison warden has never been held liable in such circumstances. The privilege of the jailor to impose the confinement in such a case is, we think, quite as time-

honored in the Anglo-American common law as is the immunity of members of the legislature and of judges from civil liability for acts done within the sphere of their judicial activities. See Ravenscroft v. Casey, 2 Cir., 1944, 139 F.2d 776, 778; Martin v. Collins, 1896, 165 Mass. 256, 43 N.E. 91; Rush v. Buckley, 1905, 100 Maine 322, 327, 61 A. 774, 70 L.R.A. 464; Langen v. Borkowski, 1925, 188 Wis. 277, 206 N.W. 181, 43 A.L.R. 622.

We hold that the two superintendents of the confining institutions in the case at bar are not liable to Francis under 8 U.S.C. § 43, in the circumstances of this case, in the absence of an express declaration by the Congress of its intention to wipe out so well-established a privilege, especially when it is considered that the judge who issued the commitment order is not liable under the same statute.

The judgment of the District Court is affirmed.