Paul S. ADAMIAN, Plaintiff,

v.

The UNIVERSITY OF NEVADA et al., Defendants.

Civ. No. R–2530.

United States District Court, D. Nevada.

April 16, 1973.

Charles E. Springer, Ltd., Reno, Nev., for plaintiff.

Thomas G. Bell, Deputy Atty. Gen., Las Vegas, Nev., for defendants.

## MEMORANDUM OPINION

ROGER D. FOLEY, Chief Judge.

The plaintiff, a tenured professor of English of the University of Nevada, was discharged by action of the University's Board of Regents for attempting to stop a motorcade and for attempting to disrupt ceremonies of the Governor's review of ROTC activities, which ceremonies were conducted on the Reno campus of the University.

Plaintiff, alleging that jurisdiction exists under the Civil Rights Act, Title 28, U.S.C., § 1343, and Title 42, U.S.C., § 1983, brought this action against the University of Nevada, the Board of Regents of the University of Nevada, Dr. Louis E. Lombardi, Fred M. Anderson, Procter E. Hug, William W. Morris, Helen R. Thompson, James H. Bilbray, Archie C. Grant, Paul McDermott, Harold J. Jacobsen, Mel Steninger, Molly Knudtsen, and John Does I through VIII.

### A.

#### Parties Defendant

On December 23, 1971, Judge Philip C. Wilkins dismissed the action as to the University of Nevada and the defendant Board of Regents because these state agencies are not a "person" within the meaning of the Civil Rights Act, 42 U.S.C. § 1983. Whitner v. Davis, 410 F.2d 24 (9th Cir. 1969). Judge Wilkins also dismissed the John Doe defendants. The Regents are being sued, both individually and in their representative capacities. Plaintiff seeks from this Court an order directing that plaintiff be reinstated with back pay and an award of damages for the violation of his civil rights. The Court is being asked to:

1. Order the members of the Board of Regents *now in office*, in their *representative* capacities, to reinstate the plaintiff and compensate him for loss of earnings.

2. Award the plaintiff damages for the violation of his civil rights against those Regents, in their *individual* capacities, *then in office*, responsible for his discharge.

Although the Board of Regents as a state agency is not a "person" within the Civil Rights Act, the Regents themselves are "persons" and can be sued both as individuals and in their representative capacities. The rule is explained in Harkless v. Sweeny Independent School District, 427 F.2d 319 (5th Cir. 1970), cert. den. 400 U.S. 991, 91 S.Ct. 451, 27 L.Ed.2d 439, where the Court said:

"Turning then to the officials, the trustees and the superintendent, it seems well settled that § 1983 authorizes a suit against them. Federal judicial power has long been invoked to compel state officials to discharge their constitutional duties. * * *

"In numerous cases since Monroe v. Pape, the Supreme Court has permitted relief under § 1983 against state officials sued as such, without mention of that case. * * *

"We find no prohibition in Monroe v. Pape against the exercise of federal judicial power through § 1983 to redress constitutional wrongs through requiring appropriate official acts by officials sued in their representative capacities. We therefore conclude that § 1983 includes school district trustees and school superintendents, acting in their representative as well as their individual capacities, within the meaning of 'person' as the term is used in § 1983 for the purposes of the equitable relief sought here."

The Ninth Circuit lays down the same rule. In Whitner v. Davis, 410 F.2d 24 (9th Cir. 1969), at page 30 the Court said:

"Individuals, sued in their capacity as trustees of a state agency, are not protected by the Eleventh Amendment

any more than the agency itself is protected by that Amendment. Moreover, the allegations and prayer of plaintiff's complaint make it clear that this is not intended to be exclusively a suit against the State of Washington. Plaintiff seeks monetary damages and unspecified equitable relief against the personal defendants as individuals as well as in their capacities as president and trustees of the College or Attorney General of the state."

The rule is also followed in Williams v. Eaton, 443 F.2d 422 (10th Cir. 1971), and Hayes v. Cape Henlopen School District, 341 F.Supp. 823 (D.C. Del.1972). It is not necessary for the plaintiff to amend the complaint to include the present members of the Board of Regents who are being sued in their representative capacities. The present Regents are already properly before this Court because the plaintiff has sued all of the Regents in their representative capacities. This is accomplished by F.R.Civ.P. 25(d)(1) which states in pertinent part:

"When a public officer is a party to an action in his official capacity and during its pendency dies, resigns, or otherwise ceases to hold office, the action does not abate and his successor is automatically substituted as a party. Proceedings following the substitution shall be in the name of the substituted party, but any misnomer not affecting the substantial rights of the parties shall be disregarded."

The applicability of Rule 25(d)(1) to the instant case is explained in the Advisory Committee's Note of 1961 to Subdivision (d) found in 3B Moore's Federal Practice, Section 25.01(13):

"Thus the amended rule will apply to actions against officers to compel performance of official duties or to obtain judicial review of their orders. It will also apply to actions to prevent officers from . . . . enforcing unconstitutional enactments. . . . Excluded from the operation of the amended rule will be the relatively infrequent actions which are directed to securing money judgments against the named officers enforceable against their personal assets . . . ."

Therefore, the Regents being sued in their representative capacities are those Regents *who presently are members* of the Board of Regents. Those Regents who are being sued in their individual capacities are those Regents *who were members* of the Board of Regents at the time of plaintiff's dismissal.

## B.

### *Overbreadth and Vagueness*

The plaintiff has moved for partial summary judgment on the claim against the Regents in their representative capacities seeking reinstatement and back pay. The plaintiff argues that the University regulation upon which the Regents relied to terminate the plaintiff is unconstitutionally vague in violation of due process under the Fourteenth Amendment. Plaintiff further claims that because the regulation is unconstitutionally overbroad, as well as vague, it infringes upon his rights of free speech and assembly protected by the First Amendment, which by the Fourteenth Amendment is made applicable to the states.

The section of the University Code upon which the defendants based their determination to terminate the employment of the plaintiff was Chapter IV, Section 2.3, which reads as follows:

"The faculty member is a citizen, a member of a learned profession, and a representative of this University. When he speaks or writes as a citizen, he will be free from University censorship or discipline, but his special position in the community imposes special obligations. As a man of learning and as an educator, he knows that the public may judge his profession and this University by his utterances. At all times he strives to be accurate, to exercise appropriate restraint, to show respect for the opin-

ions of others, and to make every effort to indicate that he is not a spokesman for this University."

The defendants admit that the University Code is given the effect of law in the State of Nevada. In State v. Board of Regents, 70 Nev. 144, 261 P.2d 515 (1953), the Nevada Supreme Court held:

"In our opinion this rule (university tenure regulations), having been duly established, has the force and effect of statute."

Therefore, in deciding the constitutionality of Section 2.3, the Court will not be concerned with the question whether disciplinary rules must meet the same vagueness and overbreadth criteria as statutes and ordinances. The instant case is distinguishable from cases like Sword v. Fox, 446 F.2d 1091 (4th Cir. 1971), which holds that the same specificity of language is not required for college disciplinary rules as is required for statutes. In the instant case, the section of the University Code under scrutiny has the effect of a statute.

For this challenge to the substantive constitutionality of the University Code section, whether or not the plaintiff received procedural due process and whether or not the plaintiff's conduct could conceivably be said to be proscribed by Section 2.3, is irrelevant. Although this Court does not reach the question, if it be assumed that the plaintiff's conduct was not constitutionally protected and such conduct could be prohibited by a properly drawn regulation, the plaintiff can nonetheless challenge the substantive constitutionality of the section under which he was terminated. As the Court stated in Soglin v. Kauffman, 418 F.2d 163 (7th Cir. 1969):

"Likewise, the nature of the conduct attributed to plaintiffs has no effect on their standing to challenge the application of the misconduct doctrine as the basis for the proceedings taken against them. They are entitled to contend that the disciplinary proceedings were invalid deprivations of due proc-

ess because based upon nonexistent or unconstitutionally vague standards. It is well settled that a statute threatening the exercise of First Amendment freedoms because of overbreadth is subject to attack

' * * * with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity. Thornhill v. Alabama, 310 U.S. 88, 97–98, 60 S.Ct. 736, 741–742, 84 L.Ed. 1093; NAACP v. Button, 371 U.S. [415], at 432–433, 83 S.Ct. [328] at 337–338, 9 L.Ed.2d 405; cf. Aptheker v. Secretary of State, 378 U.S. 500, 515–517, 84 S.Ct. 1659, 1668–1669, 12 L.Ed.2d 992; United States v. Raines, 362 U.S. 17, 21–22, 80 S.Ct. 519, 522–523, 4 L.Ed.2d 524. We have fashioned this exception to the usual rules governing standing, see United States v. Raines, supra, because of the " * * * danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application". NAACP v. Button, supra, 371 U.S. at 433, 83 S.Ct. at 338.' Dombrowski v. Pfister, 380 U.S. 479, 486–487, 85 S.Ct. 1116, 1121, 14 L.Ed.2d 22."

█ The rule is also explained by the Supreme Court in Coates v. City of Cincinnati, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1970):

"The ordinance before us makes a crime out of what under the Constitution cannot be a crime. It is aimed directly at activity protected by the Constitution. We need not lament that we do not have before us the details of the conduct found to be annoying. It is the ordinance on its face that sets the standard of conduct and warns against transgression. The details of the offense could no more serve to validate this ordinance than could the details of an offense charged under an ordinance suspending uncon-

ditionally the right of assembly and free speech."

Therefore, the plaintiff's conduct, as well as the procedures followed by the Regents, is irrelevant with regard to this constitutional challenge.

The plaintiff argues that the section is constitutionally infirm because of its vagueness, i. e., it violates the due process clause of the Fourteenth Amendment. In the alternative, since freedom of speech and assembly are involved, the plaintiff argues that the section violates the First Amendment as embodied in the Fourteenth by reason of its vagueness and overbreadth. When the First Amendment is involved in the scrutiny, the standard becomes more exacting.

The "vagueness" test under the due process clause of the Fourteenth Amendment is explained in Connally v. General Construction Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926):

"A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law."

This has remained the standard of vagueness down through the years. In the instant case, men of common intelligence would certainly be confused about the conduct allowed or proscribed in the section in question.

When the First Amendment element is added, the unconstitutionality becomes certain. The District Court, in Soglin v. Kauffman, 295 F.Supp. 978 (W.D.Wis. 1968), aff. 418 F.2d 163 (7 Cir.), lucidly explained the additional scrutiny required when First Amendment freedoms were involved:

"Moreover, the vagueness doctrine is not to be conceived as being limited solely to the concept of fair notice as an element of substantive due process. The vagueness doctrine embodies a First Amendment concept as well:

'The objectionable quality of vagueness and overbreadth does not de-pend upon absence of fair notice to a criminally accused or upon unchanneled delegation of legislative powers, but upon the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application.' NAACP v. Button, 371 U.S. 415, 432–433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963).

'Vague laws in any area suffer a constitutional infirmity. When First Amendment rights are involved, we look even more closely lest, under the guise of regulating conduct that is reachable by the police power, freedom of speech or of the press suffer.' Ashton v. Kentucky, 384 U.S. 195, 200, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966).

"Whether a given rule 'involved' First Amendment rights so as to require that it be looked to 'more closely' is often relatively easy to determine: a rule against bank robbery does not; a rule regulating public gatherings probably does. A rule against 'misconduct' is so grossly vague that possible involvement of First Amendment rights cannot be ignored. It is not permissible to 'presume that the statute curtails constitutionally protected activity as little as possible.' NAACP v. Button, supra, 371 U.S. at 432, 83 S.Ct. at 337."

The regulation pursuant to which the plaintiff was terminated is so overbroad that it could authorize a tenured professor's termination for utterances which were inaccurate, a situation held constitutionally impermissible by Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). The wide range of constitutionally protected activities which could be infringed by this regulation seems unlimited. The inadequacy of the regulation is apparent on its face. The regulation is so vague that men of common intelligence could differ as to its meaning and some of the apparently proscribed conduct is conduct which is con-

stitutionally permissible. The combination of the vagueness and the overbreadth make the section invalid on its face. The section violates the due process clause of the Fourteenth Amendment by reason of its vagueness and violates the First Amendment as embodied in the Fourteenth Amendment by reason of its vagueness and overbreadth.

The Court makes no finding as to the conduct of the plaintiff which resulted in the plaintiff's termination. Under a properly drawn regulation that gives full protection to a professor's constitutional rights, the plaintiff may well have been properly discharged. The Court does not reach the issue of whether the plaintiff's conduct was constitutionally protected because, regardless of what the plaintiff did, he could not be dismissed under the unconstitutional regulation. The Court finds only that the plaintiff was terminated by the Board of Regents for allegedly violating Chapter IV, Section 2.3, of the University Code. Because the section upon which the Regents relied is substantively unconstitutional, the Regents cannot rely on it and the plaintiff must be reinstated and compensated for loss of earnings.

 It is clear that this Court has the power under 42 U.S.C. § 1983 to order the reinstatement of the professor. Such reinstatement relief will be granted the plaintiff in his suit against the Regents in their representative capacities. Harkless v. Sweeny Independent School District, supra; Hayes v. Cape Henlopen School District, supra; Ramsey v. Hopkins, 447 F.2d 128 (5th Cir. 1971). Can the Court, consistently with the Eleventh Amendment, order the Regents, being sued in their representative capacities, to pay the plaintiff back pay? The Court, in *Harkless*, supra, explained it this way:

> "Section 1983 was designed to provide a comprehensive remedy for the deprivation of federal constitutional and statutory rights. The prayer for back pay is not a claim for damages, but is an integral part of the equita-

ble remedy of injunctive reinstatement. Reinstatement involves a return of the plaintiffs to the positions they held before the alleged unconstitutional failure to renew their contracts. An inextricable part of the restoration to prior status is the payment of back wages properly owing to the plaintiffs, diminished by their earnings, if any, in the interim. Back pay is merely an element of the equitable remedy of reinstatement." (Citations omitted.)

Therefore, the back pay is not a judgment for damages running against the state via the Regents in their representative capacities, but is, rather, part of the equitable relief this Court can order. Other cases recognize back pay as an integral part of the equitable remedy of reinstatement. Jinks v. Mays, 464 F.2d 1223 (5th Cir. 1972); McFerren v. County Bd. of Ed. of Fayette Co., Tenn., 455 F.2d 199 (6th Cir. 1972); Horton v. Lawrence County Bd. of Education, 449 F.2d 793 (5th Cir. 1971); Smith v. Hampton Training School for Nurses, 360 F.2d 577 (4th Cir. 1966); Schreiber v. Joint School District No. 1, Gibraltar, Wis., 335 F.Supp. 745 (E.D.Wis.1972). The amount of back pay would be the wages owing from the date of dismissal to the present date of reinstatement diminished by the plaintiff's earnings, if any, during the period of his dismissal. Ramsey v. Hopkins, supra, and Harkless v. Sweeny Independent School Dist., supra.

Plaintiff's motion for partial summary judgment is granted.

## C.

### *Qualified Governmental Immunity*

 The defendants argue in support of their motion for summary judgment that they acted in good faith when they voted to terminate the plaintiff's employment contract and therefore are within the defense of qualified governmental immunity. At the outset, it must be emphasized that any qualified immunity would shield the Regents only

in their individual capacities. The immunity would prevent an award of damages against the individual Regents, but the immunity does not shield the Regents being sued in their representative capacities from equitable relief. In Roth v. Board of Regents of State Colleges, 310 F.Supp. 972 (W.D.Wis.1970), the Court said:

"The purpose of common law immunity enjoyed by the judiciary and legislature, here sought to be extended in a qualified form to the defendant Board and university president, is to preserve the integrity and independence of those bodies, and to insure that judges and legislators will act on their free, unbiased convictions, uninfluenced by apprehensions of consequences . . . Such considerations do not support extending, nor have courts extended, the doctrine to shield officials from the type of equitable relief here requested [reinstatement of professor]."

The most cogent explanation of the qualified governmental immunity which would shield the defendants from personal liability for their good faith acts is found in Bennett v. Gravelle, 323 F. Supp. 203 (D.C.Md.1971), where the Court says, at page 212:

"The Supreme Court has not definitively spoken on the applicability of the doctrine of governmental immunity in actions brought under section 1983 against local governmental agency officials, such as the defendants in this case. Nevertheless, while such officials may not be entitled to the absolute immunity which has been accorded to all legislators and judges, they are still entitled to a limited or a qualified immunity. This interpretation is in accordance with the general intent and tenor of the Act. As was stated in Jobson v. Henne, 355 F.2d 129, 133 (2d Cir. 1966), 'to hold all state officers immune from suit would very largely frustrate the salutary purpose of this provision.' But to take away all immunity would seem to give the section a meaning that Congress did not intend. See Hoffman v. Halden, 268 F.2d 280, 300 (9th Cir. 1959). In Cobb, supra [Cobb v. City of Malden, 202 F.2d 701 (1st Cir. 1953)], the Court stated:

a roughly accurate generalization that members of a city council, and other public officers not in the exceptional category of officers having complete immunity, would have a qualified privilege, gives them a defense against civil liability, for harms caused by acts done by them in good faith in performance of their official duty as they understood it. Id., 202 F.2d at 707.

"The Court in Pierson [Pierson v. Ray, 386 U.S. 547, 554, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967)], in addition to reaffirming the common law immunity of judges, specifically held that the defense of *good faith* and *probable cause* was available in an action under section 1983 to police officers who had arrested the petitioners, acting under a statute which was subsequently held to be unconstitutional but which the officers had probable cause to believe was valid, 386 U.S. at 555–557, 87 S.Ct. 1213. The Court thus made it clear that state officers, although not entitled to an absolute and unqualified immunity, have at least a limited immunity for acts done by them in good faith within the scope of their official duties. Good faith and probable cause are defenses not because of any language in section 1983, but because section 1983 must be read in a manner consistent with the background of common law immunities.

"In Cobb, Judge Magruder stated that 'the Act merely expresses a prima facie liability, leaving to the courts to work out, from case to case, the defenses by way of official privilege which might be appropriate to the particular case.' 202 F.2d at 706. In Francis v. Lyman, the learned judge said that 'we think it no longer appropriate' to 'give effect to the statute in its literal wording.' 216 F. 2d 583, 587 (1st Cir. 1954); instead,

it is the duty of the court to 'fit the statute as harmoniously as may be into the familiar and generally accepted legal background, and to confine its application, within reason, to those situations which might possibly have had the approval of the Congress if it had specifically adverted to the particular cases, bearing in mind the basic purposes which gave rise to the legislation in the first place.' Id. at 587." (Emphasis supplied.)

This qualified immunity has been phrased differently in many courts. In Hayes v. Cape Henlopen School Dist., 341 F.Supp. 823. (D.C.Del.1972), the Court said, at page 829:

"As public officials exercising discretion while performing their duties, the individual defendants possess a qualified privilege precluding liability for the performance of official responsibilities if undertaken in good faith."

In McLaughlin v. Tilendis, 398 F.2d 287 (7th Cir. 1968), a probationary teacher brought a civil rights action to gain reinstatement after dismissal allegedly solely because of union membership. The Court explained the limited application of the qualified immunity:

"To hold defendants absolutely immune from this type of suit would frustrate the very purpose of Section 1983 . . . At best, defendants' qualified immunity in this case means that they can prevail only if they show that plaintiffs were discharged on justifiable grounds. Thus here a successful defense on the merits merges with a successful defense under the qualified immunity doctrine."

The Ninth Circuit approach seems to deal with good faith and whether the official's acts were discretionary. In Hoffman v. Halden, 268 F.2d 280 (9th Cir. 1959), the Court of Appeals held:

" . . . we are content to . . . extend immunity to a state officer for his discretionary acts within the scope of his authority."

In adopting the "immunity for discretionary acts" approach, the Ninth Circuit relied on several common law immunity cases which were not Civil Rights cases. It is important to note that in Hoffman the Court said:

"This approach says we will not inquire, subjectively—into their state of mind—where they are exercising a discretionary function."

If the rule of the Ninth Circuit is simply one of immunity for discretionary acts, this Court would merely have to decide whether the firing of the plaintiff was a discretionary act within the scope of the Regents' authority. It would seem that under this approach the good faith of the Regents would be irrelevant, and the Court could grant summary judgment for the Regents in the suit against them in their individual capacities if the Court found their actions to be discretionary within the scope of their authority. The immunity for discretionary acts approach was followed in Silver v. Dickson, 403 F.2d 642 (9th Cir. 1968), and as recently as 1971 in Boreta v. Kirby, 328 F.Supp. 670 (N.D.Cal. 1971), where the Court said:

"The determination of whether defendant Figoni [Investigator for the California Department of Beverage Control] can claim governmental immunity is dependent upon whether his alleged actions can be considered *discretionary acts* and whether they were done within the *scope of his authority*." (Emphasis supplied.)

There was no mention of a good faith defense in either case.

The Ninth Circuit case which adopted the immunity for discretionary acts approach for Civil Rights cases, *Hoffman*, was decided eight years before the Supreme Court addressed the issue in Pierson v. Ray, 386 U.S. 547, 554, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967). The Supreme Court in *Pierson* made it clear that state officers, although not entitled to an absolute and unqualified immunity, have at least a limited immunity for acts done by them in good faith within the scope of their official duties. In *Silver* and *Boreta,* which adopted the

test of *Hoffman,* the courts do not discuss *Pierson,* which antedated them. Every circuit, except possibly the Ninth, has adopted the good faith test for qualified governmental immunity. If the good faith test, rather than the immunity for discretionary acts test, is followed, this Court cannot grant summary judgment to the Regents in the suit against them in their individual capacities because of the factual issue of good faith and malice. As was stated in Endicott v. Van Petten, 330 F.Supp. 878 (D.C.Kan.1971):

> "Since the immunity issue depends upon the determination of whether the defendants acted in good faith, it must await factual determination at a later date, in the face of a specifically plead allegation that defendants' actions were willful and malicious, obviously excluding a good faith basis."

One Ninth Circuit case has recognized the apparent impropriety of the immunity for discretionary acts test following the *Pierson* decision. In Donovan v. Reinbold, 433 F.2d 738 (9th Cir. 1970), the Court said:

> "Their alternative contention is that state officials are immune from liability for discretionary acts done within the scope of their authority. Silver v. Dickson (9th Cir. 1968) 403 F.2d 642 and Hoffman v. Halden (9th Cir. 1959) 268 F.2d 280 cautiously extend immunity to some state officials performing some kinds of discretionary acts. Thus in Silver, immunity was extended to members of a state parole board in the performance of their discretionary duties in denying parole. In Hoffman, immunity was recognized for a jailor or keeper who refused to release a prisoner held on warrant or commitment. Neither case stands for the broad principle that all public officials are immune from Civil Rights Act liability if their acts were discretionary and were done within the scope of their official duties."

Then follows a footnote which states:

> "The Supreme Court has never adopted this doctrine. Aside from judicial and legislative immunity, the Court seems to offer public officers only the defense of 'good faith'. See Pierson v. Ray . . . ."

The *Boreta* case, which came after *Donovan,* is a District Court case which applied the discretionary act test without even mentioning "good faith" or the *Pierson* and *Donovan* cases. Since *Donovan* is the most recent Ninth Circuit Court of Appeals case and it recognizes that the "Court seems to offer public officers only the defense of 'good faith' ", this Court believes it should not follow the Ninth Circuit cases of *Hoffman, Silver* and *Boreta,* but apply in the instant case the "good faith" test for qualified governmental immunity, rather than the discretionary act test. It would appear that the discretionary act test goes too far in emasculating the Civil Rights Act and is contrary to the Supreme Court in *Pierson.*

■ Therefore, this Court adopts the good faith test for qualified governmental immunity as most recent courts have, and therefore denies the Regents' motion for summary judgment as to their individual liability because of the unresolved genuine issue of material fact.

### D.

### *Certain Regents Entitled to Summary Judgment*

■ Defendants William W. Morris, Helen R. Thompson and Mel Steninger seek summary judgment in their favor on the grounds that they were not members of the Board of Regents when the plaintiff was terminated. Defendant James H. Bilbray seeks summary judgment in his favor on the grounds that although a member of the Board of Regents when the plaintiff was terminated, he voted against termination. Defendant Archie C. Grant seeks summary judgment in his favor on the grounds that although a member of the Board of Regents when the plaintiff was terminated, he was not present when the Board of Regents acted to terminate plaintiff. Each of the above said defendants is entitled to summary judg-

ment in his favor, as to any possible individual liability to plaintiff. Those of the above said defendants that are now members of the Board of Regents shall remain defendants herein in their representative capacities only. Those who are no longer members of the Board of Regents are dismissed.